## ANGEL FRANCISCO BREARD

### V.

## COMMONWEALTH OF VIRGINIA

Record Nos. 931730 and 931731

June 10, 1994

Present: All the Justices

*Richard J. McCue; Robert L. Tomlinson, II,* for appellant.
*Donald R. Curry, Senior Assistant Attorney General (James S.*
*Gilmore, III, Attorney General,* on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

These appeals require review of a capital murder conviction and
sentence of death imposed upon Angel Francisco Breard (Record
No. 931730) and of Breard's conviction of attempted rape (Rec-
ord No. 931731).

## I

### PROCEEDINGS

Breard was indicted for capital murder, *i.e.*, the willful, deliber-
ate, and premeditated killing of Ruth Dickie in the commission of,
or subsequent to, rape or attempted rape. Code § 18.2-31(5).
Breard also was indicted for the attempted rape of Dickie.

In the first phase of a bifurcated jury trial conducted pursuant
to Code §§ 19.2-264.3 and -264.4, a jury convicted Breard of cap-
ital murder. The jury also convicted Breard of attempted rape,
fixed his imprisonment at 10 years, and imposed a $100,000 fine.

In the second phase of the trial, the jury fixed Breard's punish-
ment at death for the capital murder, premised upon findings of

both the "vileness" and the "future dangerousness" predicates. Code § 19.2-264.2. After considering a report prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court sentenced Breard in accord with the jury verdicts.

We have consolidated the automatic review of Breard's death sentence with his appeal of the capital murder conviction. Code § 17-110.1(F). By order entered November 29, 1993, Breard's appeal of the attempted rape conviction was certified from the Court of Appeals. Code § 17-116.06. That appeal has been consolidated with the capital murder appeal, and both have been given priority on our docket. Code § 17-110.2.

## II

## THE CRIMES

In February 1992, the victim, Ruth Dickie, resided alone at 4410 North Fourth Road, Apartment 3, in Arlington County. She was 39 years of age and unmarried. Breard was living in an apartment a short distance from Dickie's apartment.

About 10:00 or 10:15 p.m. on February 17, 1992, Dickie left an Arlington restaurant. About 10:30 or 10:45 p.m., Ann Isch, who lived in an apartment directly below Dickie's, heard Dickie and a man arguing loudly in the hall. Isch heard Dickie say, "[K]eep your hands off me." According to Isch, the arguing continued as she heard Dickie and the man enter Dickie's apartment. Almost immediately thereafter, when everything became quiet, Isch called the apartment complex maintenance man.

Upon receiving Isch's call, the maintenance man, Joseph King, went to Dickie's apartment. King knocked on the apartment door and heard "something that sounded like something being drug across the floor." After receiving no response to his knocking, King called the police.

When the police arrived, King gave them a master key. Upon entering the apartment, the police found Dickie lying on the floor. She was on her back, naked from the waist down, and her legs were spread wide. She was bleeding profusely and did not appear to be breathing.

The police observed a "shiny . . . dried . . . body fluid" on Dickie's pubic hair and on her inner thigh. Hairs were found clutched in her bloodstained hands and on her left leg. Dickie's underpants had been torn from her body. The police found

Dickie's eyeglasses, without one lens, in the living room, and the missing lens was found under her body. A telephone receiver located near her head was covered with blood. In the room where Dickie's body was found, the police also found her shoes and her pants with some buttons missing. Dickie's purse was on the floor just inside the front door, and her set of keys was on the floor between her legs.

An autopsy revealed that Dickie had sustained five stab wounds to the neck. Two of the wounds would have caused her death.

The body fluid found on Dickie's pubic hair and inner thigh was subjected to a serological examination and identified as semen. No semen was detected on vaginal or anal swabs.

In the course of their investigation, the police obtained a sample of Breard's blood and samples of his head and pubic hair. The hair samples were subjected to microscopic examination, and the blood sample was subjected to enzyme testing and DNA analysis.

The foreign hairs found on Dickie's body were determined to be identical in all microscopic characteristics to the hair samples taken from Breard. The hairs found clutched in Dickie's hand were Caucasian hairs "microscopically like" Dickie's own head hair and bore evidence that they had been pulled from her head by the roots.

The semen found on Dickie's pubic hair matched Breard's enzyme typing in all respects. On all five of the genetic probes used in the DNA testing, Breard's DNA profile matched the DNA profile of the semen found on Dickie's body.

Breard is a native of Argentina, and his DNA profile occurs in only one in seventeen million members of the Hispanic population. Only 1.7% of the general population has Breard's enzyme typing.

At trial, Breard testified in his own defense. He stated that, on the night of February 17, 1992, he left his apartment armed with a knife because he thought he would "try to do someone," meaning that he "wanted to use the knife to force a woman to have sex with [him]." Breard admitted that he engaged Dickie in conversation on the street, followed her to her apartment, argued with her, and forced himself into her apartment. Breard also admitted that he stabbed Dickie, removed her pants, and got "on top of her." While he was on Dickie, he heard someone knocking on the door. He "got scared," opened a kitchen window, jumped to the ground, and fled. Breard also testified that, at the time, he believed that he was under a curse placed upon him by his ex-wife's father.

## III

## CLAIMS PREVIOUSLY DECIDED

■ Breard presents a number of claims without offering sufficient reasons to warrant deviation from our previously expressed views. Therefore, we will adhere to our prior holdings and reject these claims. Breard's claims and our prior holdings are set forth below.

### A

The trial court erred in refusing to grant a pretrial evidentiary hearing on the constitutionality of death by electrocution. This claim was rejected in *Ramdass* v. *Commonwealth*, 246 Va. 413, 419, 437 S.E.2d 566, 569 (1993).

### B

The trial court erred in denying Breard's motion to prohibit the imposition of the death penalty for the following reasons:

#### 1

Virginia's death penalty statutes are unconstitutional because they do not require the jury to find beyond a reasonable doubt that aggravating factors outweigh mitigating factors. Answered in *Mickens* v. *Commonwealth*, 247 Va. 395, 403, 442 S.E.2d 678, 684 (1994). Furthermore, the court failed to properly instruct the jury about how it should consider mitigating evidence. Answered by *Satcher* v. *Commonwealth*, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1319 (1993).

#### 2

Virginia's "vileness" and "future dangerousness" aggravating factors are unconstitutionally vague and inherently unreliable. Answered in *Mickens*, 247 Va. at 403, 442 S.E.2d at 684.

#### 3

The "future dangerousness" aggravating factor is unconstitutionally applied because the jury is permitted to consider evidence of unadjudicated acts of misconduct without an instruction that

such acts must be proved beyond a reasonable doubt. Answered by *Satcher*, 244 Va. at 228, 421 S.E.2d at 826; *Stockton* v. *Commonwealth*, 241 Va. 192, 210, 402 S.E.2d 196, 206, *cert. denied*, 502 U.S. 902, 112 S.Ct. 280 (1991).

### 4

The death penalty is arbitrarily and discriminatorily imposed, is repugnant to society's "evolving standards of decency," and is excessive. Answered by *Satcher*, 244 Va. at 228, 421 S.E.2d at 826. The death penalty constitutes cruel and unusual punishment *per se*. Answered by *Spencer* v. *Commonwealth*, 238 Va. 275, 280-81, 384 S.E.2d 775, 777-78 (1989), *cert. denied*, 493 U.S. 1036 (1990).

### 5

The trial court erred in denying Breard additional preemptory challenges. Answered by *Beavers* v. *Commonwealth*, 245 Va. 268, 273, 427 S.E.2d 411, 416, *cert. denied*, ____ U.S. ____, 114 S.Ct. 171 (1993).

### 6

The trial court erred in denying individual and sequestered voir dire. Answered by *Stewart* v. *Commonwealth*, 245 Va. 222, 229, 427 S.E.2d 394, 399, *cert. denied*, 510 U.S. ____, 114 S.Ct. 143 (1993).

### 7

A defendant who is sentenced to death in Virginia is denied a meaningful appellate review. Answered by *Satcher*, 244 Va. at 228, 421 S.E.2d at 826.

### 8

Code § 19.2-264.5 is unconstitutional because it allows the trial court to consider hearsay information contained in a presentence report. Answered by *O'Dell* v. *Commonwealth*, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, *cert. denied*, 488 U.S. 871 (1988).

## C

The trial court erred in denying Breard's motion for a bill of particulars. Answered by *Ramdass*, 246 Va. at 419, 437 S.E.2d at 570; *Satcher*, 244 Va. at 231, 421 S.E.2d at 828; *Strickler* v. *Commonwealth*, 241 Va. 482, 490, 404 S.E.2d 227, 233, *cert. denied*, 502 U.S. 944 (1991). These cases hold that a bill of particulars is not required if the indictment gives an accused notice of the nature and character of the offense charged. In the present case, the indictment gave Breard such notice.

## IV

*Constitutionality of Trial Court's Review of Death Sentence*

Breard claims that Code § 19.2-264.5 is unconstitutional because "the death penalty can be imposed even when there has been a showing of good cause that a life sentence is appropriate." He further asserts that "[t]his process is also unconstitutional because there are no limits on the trial court's discretion and no guidelines for the court to follow in determining when the death penalty is appropriate." Therefore, he asserts, a trial court is allowed to impose the death penalty in an arbitrary and capricious manner. We find these contentions to be meritless.

Pursuant to Code § 19.2-264.5, when a jury has fixed a defendant's punishment at death, the trial court, before imposing sentence, must direct a thorough investigation by a probation officer into the defendant's history and background so that the court "may be fully advised as to whether the sentence of death is appropriate and just." After considering the report, the court, "upon good cause shown," may set aside the death sentence and impose a sentence of life imprisonment.

We think the provisions of Code § 19.2-264.5 are clear and provide a meaningful review by a trial court of a death sentence. In the present case, the trial court made an independent review of Breard's death sentence and concluded that there was no "good cause" to set it aside. Consequently, we hold that Code § 19.2-264.5 is facially constitutional and was constitutionally applied in the present case.

## V

## JURY MATTERS

■ Breard has assigned error to a number of the trial court's rulings relating to the exclusion and retention of jurors on the jury panel. The standard to be applied by a trial court in deciding whether to exclude or retain a prospective juror is whether the prospective juror's views " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Eaton* v. *Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), *quoting Adams* v. *Texas*, 448 U.S. 38, 45 (1980), *cert. denied*, 502 U.S. 824 (1991).

An appellate court, in considering this matter, must give deference to the trial court's determinations because the trial court has seen and heard the prospective jurors and, therefore, is in a better position to decide the issue. *Stewart*, 245 Va. at 234, 427 S.E.2d at 402. Consequently, a trial court's rulings in such matters will not be disturbed on appeal absent a showing of "manifest error." *Id*. With these principles in mind, we consider Breard's claims.

## A

### *Elna Broffman*

Breard contends that the trial court erred in excluding Elna Broffman from the jury. During voir dire, Broffman gave the following answers to questions propounded by the trial court and by defense counsel:

THE COURT: Is there any juror who would never vote to impose the death penalty or who would refuse to even consider it in the case?

[MS. BROFFMAN]: I might.

. . . .

THE COURT: . . . . Can you keep it as a choice in your mind if the evidence supports this, the law as the judge gives it to you seems to make it the appropriate decision? Can you consider it?

MS. BROFFMAN: Well, I oppose capital punishment.

. . . .

MS. BROFFMAN: . . . . Even if the person is guilty he's guilty. But I'm not — and I could — you know — could go for that but I — I have to admit that I do not approve of capital punishment.

THE COURT: . . . . And the question is not opposition to it. The question is, is your opposition such that you would never vote for it?

. . . .

MS. BROFFMAN: No, I can't envision any circumstances where we would be justified in imposing the death penalty —

. . . .

[DEFENSE COUNSEL]: — could [you] follow the Judge's instructions —

MS. BROFFMAN: Yes.

. . . .

[DEFENSE COUNSEL]: So that you would be able — the Judge's instructions to — to you would be that you can consider the death penalty as an alternative.

MS. BROFFMAN: I cannot consider the death penalty.

■ Over Breard's objection, the trial court excluded Broffman from the jury. The court noted that Broffman is "a truthful person of good conscience" who has "a fixed unalterable position in opposition to the death penalty and would never consider it." The record clearly supports the trial court's findings, and, accordingly, we conclude that the court did not err in excluding Broffman from the jury.

## B

### *Pauline Davis*

■ Breard contends that the trial court erred in refusing to exclude Pauline Davis from the jury for cause. During voir dire, Davis indicated that her impartiality in fixing punishment "might" be affected by photographs of the victim and of the crime scene. She further indicated, however, that she would consider any photographs admitted into evidence along with other evidence, including evidence in mitigation.

Davis also stated that a person who committed a murder probably would commit acts of violence in the future, but she said that this would depend upon the reasons for the murder. Davis further stated that, even if she found that the defendant was dangerous, she would consider all the evidence, including that in mitigation, before she decided what would be the appropriate punishment.

The trial court described Davis as being "very honest and serious" and concluded that she "could follow the law and the evidence and would not automatically impose the death penalty on any particular set of facts." Giving the trial court's findings the deference to which they are entitled, we will not disturb the findings on appeal. Therefore, we hold that the court did not err in refusing to exclude Davis from the jury for cause.

## C

### *Katherine Biggs-Silvers*

■ Breard contends that the trial court erred in refusing to exclude Katherine Biggs-Silvers from the jury panel for cause. At trial, Breard sought to have Biggs-Silvers excluded because, according to Breard, she expressed "an aversion to horror movies and anything of a gruesome nature," such as photographs of the victim and of the crime scene. Biggs-Silvers stated that, if the photographs were "really gruesome," she would be inclined to impose a more severe punishment. Upon further questioning, however, Biggs-Silvers said that she would decide the issue of punishment "in the context of all the other evidence, including whatever mitigating evidence may come from the defense."

The trial judge observed that Biggs-Silvers was "very candid," and he was satisfied that she "was going to keep an open mind on these issues until she hears the evidence." Again, according the

trial judge the deference to which he is entitled, we cannot say that he erred in refusing to strike Biggs-Silvers for cause.

## D

### Frederick Sorrell and Kenneth Millard

■ Breard contends that Frederick Sorrell and Kenneth Millard should have been excluded from the jury for cause because both men indicated that, in the absence of expert testimony, they would have difficulty finding an accused insane. Both men, however, stated that they would consider the insanity defense and that, if Breard convinced them that he met the legal definition of insanity as contained in the court's instructions, they could find him not guilty.

Based upon the "total answers of both [men]," the trial court determined that neither should be struck for cause. The court was able to observe their demeanor, and, from the record before us, we cannot say that the court erred in its ruling.

## E

### Jane Healey and Bonnie Courtney

During voir dire, Breard moved to strike Jane Healey from the jury for cause, claiming that she stated she was unsure whether she could follow the court's instructions and be objective. The trial judge denied the motion "for the moment," but stated that he would rehear the motion upon completion of voir dire. Breard, however, failed to renew the motion. The trial judge, therefore, reasonably could have assumed that Breard had acquiesced in seating Healey as a juror. Additionally, Breard could not have been prejudiced because the record shows that the Commonwealth struck Healey from the jury panel. *See Buchanan* v. *Commonwealth*, 238 Va. 389, 404, 384 S.E.2d 757, 766 (1989), *cert. denied*, 493 U.S. 1063 (1990).

■ With respect to juror Bonnie Courtney, Breard claims that the trial court erred in failing to declare a mistrial after Courtney indicated that she had read a newspaper article about the case. We will not consider this claim because Breard did not move for a mistrial in the trial court. Rule 5:25.

## VI

## GUILT PHASE

### A

*Victim's Mother's Testimony*

In the guilt phase of the trial, the Commonwealth called as a witness the victim's mother, Florence Dickie. Over Breard's objection on relevancy grounds, the mother was allowed to identify her daughter from a photograph that previously had been admitted into evidence. The witness, without further objection, testified that the victim was her only child, that her daughter wore eyeglasses, that she was 39 years old when she was killed, and that she was single and lived alone. The mother also testified that she never had heard her daughter mention the name, Angel Breard, and that she did not know of anyone who might have wanted to harm her daughter. Apparently, the mother was crying when she left the witness stand.

Four other witnesses then testified. After the trial was recessed for a lunch break, Breard moved for a mistrial, claiming that the mother's testimony had no probative value and was irrelevant. He further claimed that he was prejudiced by the mother's statement that the victim was "her only child" and by the witness' "sobbing" as she left the witness stand. The trial court denied the motion, and Breard contends that the court's ruling was reversible error. We do not agree.

A motion for a mistrial must be made promptly; otherwise, the claim is deemed to have been waived. Prompt action is required in order to allow a trial court to take whatever corrective measures it may deem to be appropriate. *Beavers*, 245 Va. at 279, 427 S.E.2d at 419. In the present case, we will not consider Breard's assignment of error relating to the denial of the motion for a mistrial because the motion was untimely. Rule 5:25.

### B

*Admission of Photographs*

Breard contends that the trial court erred in admitting into evidence a number of photographs and diagrams of the victim and of the crime scene. He asserts that "[m]any of [the] photographs were virtually identical and . . . were duplicative and cumulative"

and that the only reason for introducing so many similar photographs "was to inflame the passion of the jury."

Time and again, we have ruled that the admission into evidence of photographs depicting the victim and the crime scene is a matter resting within the sound discretion of the trial court. *See, e.g., Gray v. Commonwealth*, 233 Va. 313, 342, 356 S.E.2d 157, 173, *cert. denied*, 484 U.S. 873 (1987). This rule also applies to the admission of other demonstrative evidence. *Mackall v. Commonwealth*, 236 Va. 240, 254, 372 S.E.2d 759, 768 (1988), *cert. denied*, 492 U.S. 925 (1989). Such photographs and other evidence, though gruesome, are admissible if they adequately portray the manner in which an accused committed the offense. *Gray*, 233 Va. at 343, 356 S.E.2d at 173.

In the present case, the trial court reviewed all photographs with great care, and we find no abuse of discretion in their admission into evidence or in the admission into evidence of any diagrams.

## C

### *Expert Testimony*

█ Prior to trial, the court appointed three mental health experts to evaluate Breard's mental condition. All three had been selected by Breard's counsel. None of the three, however, testified in support of Breard's insanity defense.

At trial, after Breard had rested, the Commonwealth called the three experts as rebuttal witnesses. Over Breard's objection, the court allowed the Commonwealth to elicit testimony from the experts that they evaluated Breard at the request of his counsel.

█ We find no merit to Breard's contention that the trial court erred in allowing this testimony. The evidence was relevant because it provided background information about the experts and showed how they became involved in the case.

Breard also contends that the trial court erred in failing to declare a mistrial after the Commonwealth, in closing argument, made reference to Breard's having selected the experts. We will not consider Breard's claim because the motion for a mistrial, made after the jury retired, came too late. *Cheng v. Commonwealth*, 240 Va. 26, 39, 393 S.E.2d 599, 606 (1990).

## D

### *Jury Instructions*

Breard claims that the trial court erred in granting and refusing a number of jury instructions in the guilt phase of the trial.

#### 1

██ Breard proffered Instruction A regarding "irresistible impulse." The trial court refused the instruction, but advised Breard that he could submit an alternate instruction the next day. Breard did not object to the ruling, and, the next day, he proffered Instruction J, which the trial court granted. Breard's failure to object to the refusal of Instruction A bars him from raising this claim on appeal. Rule 5:25.

██ Breard also claims that the trial court erred in granting the Commonwealth's Instruction 13, which stated that an "irresistible impulse" must be the "product of a diseased mind." This claim is without merit because Instruction 13 correctly stated the law. *See Thompson v. Commonwealth*, 193 Va. 704, 717, 70 S.E.2d 284, 291-92 (1952).

#### 2

██ The trial court granted the Commonwealth's Instruction 11 and refused Breard's Instruction B. Both instructions defined what is meant by "willful, deliberate and premeditated." Breard voiced no objection to either the granting of Instruction 11 or the refusal of Instruction B. Therefore, we will not consider his objection to the refusal of Instruction B. Rule 5:25.

██ The court also refused Breard's Instruction L. This instruction was properly refused because it erroneously defined "premeditated" as meaning "to think out or plan beforehand." Instruction 11, on the other hand, correctly informed the jury that the intent to kill "need not exist for any particular length of time" prior to the killing. *See Stewart*, 245 Va. at 241-42, 427 S.E.2d at 407.

#### 3

██ The trial court granted the Commonwealth's Instruction 15 and refused Breard's Instruction H. The two instructions informed the jury that Breard could not be found guilty of capital

murder if his voluntary use of alcohol rendered him incapable of deliberating or premeditating. The two instructions were essentially identical, and we conclude that the trial court did not err in these rulings.

### 4

Breard proffered Instruction N, defining insanity. The trial court refused Instruction N and, instead, granted the Commonwealth's Instruction 14. Both instructions informed the jury that a person is insane if "he did not understand the nature, character and consequences of his act or he was unable to distinguish right from wrong." Instruction 14, however, added the phrase, "because of mental disease," before the above-quoted language. Breard merely argues that the additional phrase adds nothing to the instruction, and we find this argument to be without merit.

### E

### Sufficiency of the Evidence

■ Breard contends that the evidence is insufficient to support his capital murder conviction. Breard makes two arguments: (1) the evidence is insufficient to prove that the killing was willful, deliberate, and premeditated; and (2) the evidence is insufficient to prove that he raped Dickie.

The standard for reviewing the sufficiency of the evidence on appeal is well established. We must view the evidence in the light most favorable to the Commonwealth, the prevailing party at trial, and the trial court's judgment will not be disturbed unless the judgment is plainly wrong or without evidence to support it. *Beavers*, 245 Va. at 281-82, 427 S.E.2d at 421; Code § 8.01-680.

■ In the present case, the evidence established that Breard stabbed Dickie five times in the neck while he sexually assaulted her. Additionally, on the night Dickie was killed, Breard deliberately armed himself with a knife, intending "to force a woman to have sex with [him]." Clearly, the evidence supports the jury's finding that the killing was willful, deliberate, and premeditated.

■ Breard's argument with respect to proof of rape is meritless. The indictment charged Breard with the willful, deliberate, and premeditated killing of Dickie "in the commission of, or subsequent to, rape *or attempted rape*." (Emphasis added.) The jury

found Breard guilty of attempted rape, and the evidence, as previously related, fully supports that finding.

## VII

## PENALTY PHASE

### A

*Facts*

In the penalty phase of the trial, the Commonwealth presented evidence that Breard had attacked two other women. Approximately three weeks before Breard murdered Dickie, he attacked Celia Gonzales on a street in Arlington County. He grabbed Gonzales from behind, ordered her to accompany him, and told her that he had a gun. Breard ultimately released Gonzales after he had been observed by a man sitting in a nearby parked car. Before leaving, Breard told Gonzales that he knew where she lived and that he "[had] someone who's going to get [her] later."

On August 17, 1992, six months after Dickie's murder, Breard attempted to sexually assault Jeanine Yvonna Price. Breard and Price had met in Washington, D.C., and the two travelled, in Breard's automobile, to Breard's Arlington apartment.

At the apartment, Breard began kissing Price "all over." Price resisted, but Breard pulled her to the floor, sat on her stomach, and started to remove her clothing. Eventually, he removed all of her clothing and started to remove his pants.

Price began screaming for help, and Breard responded by hitting her in the face and ordering her to be quiet. Breard attempted to tie Price's hands with a telephone cord and told her that he intended to have anal intercourse with her.

A man in a nearby apartment heard Price's screams and called the police. When the police arrived, they found Price, naked and hysterical, and Breard clad only in his undershorts. Breard was arrested and, at that time, became a suspect in Dickie's murder.

Breard testified that, in the ten months since his arrest, he had become deeply religious. He prays often. He prays for Dickie and for her mother, and he intends "to keep preaching the word of God."

A volunteer for Good News Mission, a Bible-teaching institution, testified that Breard attends his Bible study class twice a week. The witness opined that Breard had had a "genuine conver-

sion to the Christian faith" and has a "thirst for reading the Bible and . . . praying."

Breard's mother testified that her son had been in a motor vehicle accident when he was five years old and that this had been a traumatic experience. Some years later, Breard was seriously injured in another motor vehicle accident. Also, Breard's father died when Breard was 18 years old. Breard's mother described him as a "very good child," and his long-time friends described him as a good person, a good worker, and one who helps others.

Apparently, Breard began to drink excessively after his marriage failed. According to his mother, "[i]t was [Breard's] marriage that brought all the problems upon him."

## B

### Jury Instructions

Breard contends that the trial court misinstructed the jury in the penalty phase of the trial.

### 1

Breard proffered Instruction BB which would have informed the jury that it could not sentence Breard to death "solely on the same factors used to convict" Breard of capital murder and that it could not use Breard's commission of a willful, deliberate, and premeditated killing during a rape or attempted rape "as the sole basis" for finding an aggravating circumstance or for imposing a death sentence. The trial court refused the instruction, and Breard contends that the court erred. We do not agree.

██ Instruction BB was erroneous. A finding of "future dangerousness" and a consequent death sentence may be based solely upon "the circumstances surrounding the commission of the offense." Code § 19.2-264.4(C); *Delong* v. *Commonwealth*, 234 Va. 357, 371, 362 S.E.2d 669, 677 (1987), *cert. denied*, 485 U.S. 929 (1988); *Smith* v. *Commonwealth*, 219 Va. 455, 478 n.4, 248 S.E.2d 135, 149 n.4 (1978), *cert. denied*, 441 U.S. 967 (1979).

### 2

██ Breard requested Instruction EE which would have told the jury that it could not consider evidence of his unadjudicated criminal conduct unless the Commonwealth proved beyond a reasonable doubt that he committed the offenses. The trial court

properly refused the instruction because, in Instruction 17, the jury was informed that, before the death penalty could be imposed, the Commonwealth must prove "future dangerousness" beyond a reasonable doubt, and this was sufficient. *Satcher*, 244 Va. at 228 n.3, 421 S.E.2d at 826 n.3.[1]

## C

### *Parole Eligibility*

During penalty-phase deliberations, the jury asked the court the following question: "With life in prison[,] how long will [Breard] be there before he is eligible for parole?" With Breard's express agreement, the judge responded in writing as follows: "I cannot answer that question and you should not concern yourselves with that."

■ Later in its deliberations, the jury asked whether it could "recommend the sentence of life without the possibility of parole?" Over Breard's objection, the court gave the jury the following written response: "You are limited to one of the three choices on sentencing you have already been given." Breard claims that the trial court erred in its response. We disagree.

The court properly answered the jury's question. A jury has no right or authority to make such a recommendation. *See Harmon v. Commonwealth*, 209 Va. 574, 581, 166 S.E.2d 232, 237 (1969); *Clarke v. Commonwealth*, 207 Va. 298, 301, 149 S.E.2d 875, 877 (1966).[2]

## VIII

### SENTENCE REVIEW

Pursuant to Code § 17-110.1, we must review Breard's death sentence on the record. In making the review, we are required to consider and determine:

---

[1] The trial court also did not err in refusing Breard's Instruction CC and in modifying his Instruction DD because the matters set forth in proffered Instructions CC and DD were adequately covered in Instructions 17 and 18, which were granted by the court. Instruction 18 directed the jury to consider mitigating circumstances before determining the appropriate sentence.

[2] We will not consider Breard's claim regarding the Commonwealth's allegedly improper closing argument in the penalty phase because Breard requested neither a cautionary instruction nor a mistrial. *See Cheng*, 240 Va. at 38-39, 393 S.E.2d at 605-06.

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

## A

*Passion, Prejudice, or Other Arbitrary Factor*

Breard asserts only two bases for claiming that the death sentence was imposed under the influence of passion, prejudice, or another arbitrary factor. First, he claims that the "testimony of the victim's sobbing mother was . . . designed to arouse the passion and prejudice of the jury." The trial court found that the mother's testimony was "minimal" and "controlled." We cannot say that this testimony aroused the passion and prejudice of the jury, thereby causing the jury to impose the death penalty.

Second, Breard asserts that "[t]he passion and prejudice of the jury was also aroused by the admission of testimony concerning unadjudicated criminal offenses against two other women." He also contends, as previously discussed, that the jury should have been instructed that such offenses had to be proved by evidence beyond a reasonable doubt. We consistently have held that such evidence is proper and relevant for the jury's consideration of the "future dangerousness" predicate. *See, e.g., Stockton*, 241 Va. at 209-10, 402 S.E.2d at 206; *Spencer v. Commonwealth*, 238 Va. 295, 317, 384 S.E.2d 785, 798-99 (1989), *cert. denied*, 493 U.S. 1093 (1990). We also have held that it is this predicate, not specific unadjudicated offenses, that must be proved by evidence beyond a reasonable doubt. *Satcher*, 244 Va. at 228 n.3, 421 S.E.2d at 826 n.3.

Pursuant to Code § 17-110.1, we have reviewed the record, and we do not find anything therein to support a finding that the jury, in imposing the death sentence, was influenced by passion, prejudice, or any other arbitrary factor. Breard does not contend that the evidence is insufficient to support a finding by the jury of both the "vileness" and the "future dangerousness" predicates, and, clearly, both findings are fully supported by the evidence.

## B

### *Proportionality*

■ The test we must apply in conducting the proportionality review is "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." *Jenkins* v. *Commonwealth*, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), *cert. denied*, 507 U.S. ___, 113 S.Ct. 1862 (1993); Code § 17-110.1(C)(2). To guide us in applying the test, we have compiled and examined the records of all capital murder cases reviewed by this Court, Code § 17-110.1(E), including those in which a life sentence was imposed. We have given particular attention to those cases where the sentence of death was based on both the "vileness" and "future dangerousness" predicates. Based upon this review, we conclude that Breard's death sentence is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth. *See, e.g., Spencer*, 238 Va. at 318-20, 384 S.E.2d at 799-800. *See also Mueller* v. *Commonwealth*, 244 Va. 386, 413-14, 422 S.E.2d 380, 397 (1992), *cert. denied*, 507 U.S. ___, 113 S.Ct. 1880 (1993); *Satcher*, 244 Va. at 261, 421 S.E.2d at 845-46.

## IX

## CONCLUSION

We find no reversible error in the judgments of the trial court, and, after our review of the death sentence as required by Code § 17-110.1, we hold that the capital murder conviction and the sentence of death should be affirmed. Accordingly, we will affirm the judgments.

Record No. 931730 — *Affirmed.*
Record No. 931731 — *Affirmed.*