COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Fulton* and Lorish

SCOTT EDWARD SIMANDL

v.      Record No. 1278-24-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION**
PER CURIAM
JANUARY 6, 2026

FROM THE CIRCUIT COURT OF PAGE COUNTY
Clark A. Ritchie, Judge

(J. Lloyd Snook, III; Snook & Haughey, P.C., on briefs), for
appellant.

(Jason S. Miyares, Attorney General; Liam A. Curry, Assistant
Attorney General, on brief), for appellee.

Following a jury trial held in the Circuit Court of Page County ("trial court"), Scott

Edward Simandl ("Simandl") was convicted of the first-degree murder of Jay Campbell ("Jay")

and the aggravated malicious wounding of Justice Campbell ("Justice"). Simandl was also

convicted of two counts of the use of a firearm in the commission of those felonies. The trial

court sentenced Simandl to life in prison for the first-degree murder of Jay, 40 years'

incarceration for the aggravated malicious wounding of Justice, and 6 years' incarceration for the

two convictions of using a firearm in the commission of a felony, with 20 years suspended in

total. On appeal, Simandl concedes to shooting and killing Jay with a firearm. He also concedes

---

* Justice Fulton participated in the decision of this case prior to his investiture as a Justice
of the Supreme Court of Virginia.

** This opinion is not designated for publication. See Code § 17.1-413(A).

to shooting and wounding Justice with a firearm. However, he assigns error to the trial court: 1) for denying his motion to strike two prospective jurors for cause, 2) for allowing a witness to testify as an expert, and 3) for denying his motion to set aside the verdict due to insufficient evidence of premeditation. Finding no error, we affirm.[1]

## I. BACKGROUND[2]

On July 21, 2022, Simandl shot both Jay and Jay's son, Justice, in their neighborhood in Shenandoah, Virginia, killing Jay and severely wounding Justice. Simandl was then indicted on charges of first-degree murder in violation of Code § 18.2-32, aggravated malicious wounding in violation of Code § 18.2-51.2, and two counts of using a firearm in the commission of a felony in violation of Code § 18.2-53.1. The matter proceeded to a jury trial on May 1, 2023.

During voir dire, counsel for Simandl asked the venire whether "anybody recall[ed] hearing" about the case in "any media, newspaper, television, [or] social media." Juror 9 responded that she had heard about the case "[w]hen it happened." She also heard, from people whom she had told about her jury service, "that potentially [Simandl's trial] would be the case today." Juror 9 also responded on voir dire that she understood that Simandl was not required to produce any evidence of his innocence in defense of the charges and that the Commonwealth had the burden of presenting evidence of his guilt beyond a reasonable doubt. She also confirmed

---

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the appeal is wholly without merit." *See* Code § 17.1-403(ii)(a); Rule 5A:27(a).

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard the evidence of the accused in conflict with that of the Commonwealth and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that can be drawn from the evidence. *Cady*, 300 Va. at 329.

that "the evidence in this case is just what comes into evidence in this courtroom" and that she understood that no evidence "has been presented yet."

Questioning then turned to Juror 61. The trial court also asked if Juror 61 knew one of the law enforcement officers the Commonwealth intended to call as a witness, to which Juror 61 replied that she and the officer "have a lot of the same mutual friends." In addition, Juror 61 advised the court that another law enforcement witness was one of her former classmates in school. She further advised that she had previously met another potential witness and had worked with that witness's sister. Juror 61 also noted that her "soon to be sister-in-law" worked in animal control, her uncle was a retired state trooper, and she was "close" to the school resource officer at the school where she worked. Juror 61 advised the court that her familiarity with any of these potential witnesses would not affect her ability to impartially decide the case.

Following the completion of voir dire, Simandl's counsel moved to strike both Juror 9 and Juror 61 for cause. The trial court denied the motions, reasoning that Juror 9 "indicated she had heard about the case" but that "[i]t's not necessarily unusual given a small community and the fact that evidently it was in the newspaper for a brief period of time after the alleged offense." The trial court also reasoned that Juror 61 was "not a potential juror that I heard talk about having a close relationship with any of these officers," further stating, "[W]e're dealing with a small community here and there hasn't been a jury trial that I've presided over here where we didn't have . . . this sort of thing happen." Both Juror 9 and Juror 61 were later peremptorily struck from the jury panel.

At trial, the Commonwealth first called Justice as a witness. He testified that on July 21, 2022, he and Jay were riding in Jay's truck that was pulling an attached trailer. They were performing yardwork for pay at various homes located in Page County. Neither Justice nor Jay were carrying or transporting any firearms in the truck or trailer on that day. Around 5:00 p.m.,

- 3 -

Justice and Jay returned to their own neighborhood. After unloading a lawnmower at a neighbor's house to perform work, Jay parked the truck and trailer "in the front of Mr. Simandl's driveway." He recounted that until that day, Simandl, who resided "about 100 yards" from the residence of Justice and Jay, had never previously interacted with either Justice or his father, Jay.

Justice further testified that approximately 30 seconds after he started the riding lawnmower, he heard gunshots. He then drove the riding lawnmower to the location of his father's truck. Upon arrival, Justice could "see in the passenger side mirror that [his] dad wasn't moving." While "seeing if [he] could see any movement from [Jay]," Justice heard another gunshot. He then felt a bullet pierce his stomach. Justice then turned and became aware of Simandl, who was pointing a handgun at him. Justice was able to get down off of the riding lawnmower but immediately fell to the ground because "[his] leg wouldn't work." Justice got back up on his feet but began dragging his leg while trying to get to the wood line and away from Simandl. Simandl continued to fire at Justice, further striking him on his ankle. Justice testified that Simandl shot at him "at least six" times. Upon making it to the woods, Justice phoned his girlfriend, who then called 911. Upon becoming aware of the shooting, a friend of Justice drove his four-wheeler through the woods and transported Justice on the four-wheeler to a nearby property, where Justice was subsequently airlifted to a hospital.

Justice also testified about his injuries from the shooting. As a result of his injuries from Simandl, he was required to endure extensive medical treatment and rehabilitative services. Justice eventually underwent three surgeries to treat his wounds, including removal of a section of his intestinal tract requiring him to utilize a colostomy bag for eight months. Justice eventually had two plates and eight screws surgically placed in his ankle and is expected to never regain the full use of the joint.

Recounting her observations concerning the incident, Jay's wife, Lisa Campbell ("Lisa"), testified that she was sitting on her deck facing Simandl's driveway during the shooting. She testified that Jay stopped his truck, stepped outside the truck, and then got back in while interacting with a "taller slender figure." She further testified that Jay was in the truck while "his truck door was open," and then she heard "a lot more noises." After learning of the shooting from Justice's girlfriend, Lisa drove to the location of Jay's truck in her own vehicle. Upon arrival, Lisa saw that Jay's door was still open. She saw blood everywhere and that Jay had a "gigantic hole in his side." She also saw blood coming down his neck. She further testified that she did not see any firearms inside the truck, stating that Jay did not carry or keep firearms in his truck unless he was going hunting.

Page County Sheriff's Deputy Christian Pierce ("Deputy Pierce") testified that when he arrived at the scene of the shooting, Simandl emerged from his neighboring home. Deputy Pierce further testified that both he and the other law enforcement officers who arrived at the scene of the shooting began shouting at Simandl to show them his hands. In response, Simandl raised both of his middle fingers at the officers and shouted, "Fuck you, come and get me." Although Simandl subsequently offered some resistance to being placed in custody, law enforcement was able to both subdue and handcuff him. After Simandl was placed in custody, police conducted a protective sweep of his home and discovered a black handgun on a dresser in Simandl's bedroom. That handgun was later transported to the Department of Forensic Sciences for analysis. Law enforcement also searched Jay's truck but failed to find any other firearms therein or nearby.

The officers also recovered seven shell casings from "the entrance to the driveway and just off the driver's side" of Jay's truck. In addition, they recovered 9 other shell casings about 40 feet away from the driver's side door. Forensic analysis confirmed that all 16 shell casings

recovered were fired from Simandl's Glock 9-millimeter handgun. Simandl also tested positive for the presence of primer gunshot residue on both of his hands. Law enforcement also documented one bullet hole outside of the truck's driver-side door.

Law enforcement subsequently executed a search warrant on Simandl's home. While searching his home, law enforcement further found "at least one to two dozen" firearms along with "[h]undreds to thousands of rounds" of ammunition, all of which were stored in various places throughout the home. They also discovered that Simandl's home was equipped with a Blink security camera system with its cameras located in places that should have captured both the shooting and the events leading up to it. After executing a search warrant on the Blink security camera system, law enforcement later reviewed footage from the camera system and were unable to find any footage depicting the shooting. Law enforcement did recover electronic spreadsheets generated by the Blink security camera system. The spreadsheets, introduced as exhibits, contained technical details addressing account information, user identifications, devices registered to the account, wireless internet network connections, IP addresses, 15 individual cameras, and camera status information on the day of the murder. The spreadsheets also included detailed logs titled "Media History," which identified video files that had been deleted from the system, the name of the camera associated with each recording, the length of each recording, the file size of each deleted file, and the device used to delete them. In addition, the spreadsheets contained a page titled "Customer Clients," which detailed the electronic devices that had connected to Simandl's Blink account and whether that device's access to the account was active on the date of the shooting.

The Commonwealth subsequently called Patrick Siewert ("Siewert") as an expert witness regarding his inspection of the Blink security camera system operating at Simandl's home on the day of the shooting and his opinion as to why no footage of the shooting and the events leading

thereto existed. Upon the motion of Simandl's counsel, the trial court granted Simandl the opportunity to engage in voir dire of Siewert outside the presence of the jury regarding his qualifications and the scope of his expected expert testimony.[3] Following the completion of the voir dire, Simandl objected to Siewert testifying as an expert witness, contending that Siewert's proposed expert testimony regarding the interpretation of the spreadsheets did not require the testimony of an expert witness to assist the jury. Specifically, Simandl contended that the jury did not need an expert to explain the spreadsheets to them and that "[s]omeone of reasonable intelligence" could understand the document. The trial court overruled the objection and permitted Siewert to testify as an expert witness "regarding the other issues in interpreting the document and assisting the jury to do so as far as account information, whether or not an account was deleted or disconnected according to this exhibit."

Siewert then testified that he had inspected the Blink footage and spreadsheets acquired as a result of the search warrant of Simandl's home and curtilage as well as the Blink security camera system operating at Simandl's residence. He further testified that the spreadsheets detailed "account information and activity at a global level." Based upon his previous inspection, Siewert opined that the Blink security camera video files created on the day of the murder—which were captured from cameras identified as "front deck," "Simandl exit," "propane," and "front bedroom deck"—had been deleted. Siewert explained that the device used to delete those video files was an iPhone designated as "Kingdom," which was the only phone

---

[3] Simandl had filed a pre-trial motion *in limine* to exclude Siewert's testimony. The trial court took the motion under advisement, then at the start of the trial stated that it would permit Siewert to testify subject to a later determination about his expert qualifications. The trial court ruled that Siewert could not say anything about what time zone was used in the Blink spreadsheets.

that had access to the Blink account on the day of the murder. The exhibit showed that this iPhone deleted footage captured from "2022-07-21 19:30:19" to "2022-07-21 21:41:24."[4]

At the conclusion of the Commonwealth's case in chief, Simandl moved to strike. In support of his motion to strike, Simandl contended that the Commonwealth had failed to adduce any evidence of premeditation, and, as a consequence, the trial court should amend the first-degree murder charge to second-degree murder. The trial court denied the motion to strike.

Simandl then testified in his own defense. He claimed that he was coming down his driveway to do some maintenance on his gravel drive when he saw Jay's truck. He said that he always carried a Glock 17 handgun with him when he went outside as "protection against a bear." Simandl claimed that Jay had pointed a firearm at him, an act that Simandl said made him fear for his life. He further testified that he then unholstered his gun, pointed it at Jay, and shot, but explained that he "didn't have [his] eyes open" when he shot because it was "just a reaction," like a "flinch." According to Simandl, he fired six or seven shots. Simandl also conceded that he "couldn't tell" if Jay fired a shot at him but maintained that he never opened the door of the truck. Moreover, he admitted that he shot and killed Jay.

Simandl then testified that after determining that Jay "wasn't a threat," he began to walk back to his house. After hearing someone come down his road, he saw "a lawnmower with a gentleman on there" and claimed that Justice then retrieved the gun that Jay had and pointed it at Simandl. Simandl also admitted that he shot Justice, stating that he fired seven or eight shots at Justice before he lost sight of him as Justice fled into the woods. Simandl acknowledged that he "couldn't tell" if Justice ever fired at him. Simandl also denied deleting any video files from his

---

[4] During the trial, Page County Investigator Nathan Baugher had previously testified, in answer to Simandl's questions, that telephone records identify the time of a particular activity in UTC, or "Universal Time," as opposed to applying a local time zone, and that in July of 2022, UTC was four hours ahead of the prevailing local time.

Blink security camera system. On cross-examination, Simandl admitted that he could not identify the caliber of the firearm that Jay and Justice pointed at him from 10 feet away, despite owning more than 20 firearms. Simandl also conceded that he never called 911 to report what he described as two different assaults by armed gunmen or to seek assistance for himself, Jay, or Justice.

At the conclusion of Simandl's evidence, the Commonwealth presented its rebuttal evidence. Simandl then renewed his motion to strike by "incorporat[ing] [his] previous argument on [his] first motion to strike." Specifically, he stated that "[w]e present the same arguments, lack of evidence of specific intent or premeditation and overall sufficiency of the evidence." The trial court denied Simandl's renewed motion to strike.

After receiving instructions concerning the law governing the case from the trial court, the jury deliberated and returned a unanimous verdict finding Simandl guilty on all charges. Subsequently, on June 30, 2023, Simandl moved to set aside the verdict as contrary to the law and the evidence. In his motion, Simandl claimed that the trial court erred by failing to find the evidence "insufficient as a matter of law to sustain [his] convictions," by failing to exclude Juror 9 and Juror 61 for cause, and by improperly permitting Siewert to testify as an expert witness. He also claimed that the Commonwealth failed to exclude every reasonable theory of innocence. The trial court denied the motion to set aside the verdict.

Following a sentencing hearing held on September 20, 2023, the trial court sentenced Simandl to life imprisonment plus 46 years' incarceration, with 20 years suspended. Simandl appealed.

II. ANALYSIS

A. *Standard of Review*

"[A] trial court's denial of a motion to strike a juror for cause 'will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" *Keepers v. Commonwealth*, 72 Va. App. 17, 43 (2020) (alteration in original) (quoting *Townsend v. Commonwealth*, 270 Va. 325, 329-30 (2005)). Additionally, "[t]he admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion." *Utz v. Commonwealth*, 28 Va. App. 411, 423-24 (1998) (quoting *Brown v. Corbin*, 244 Va. 528, 531 (1992)). Finally, "in deciding a motion to set aside the verdict, a court only looks to whether the jury's verdict is 'plainly wrong or without evidence to support it.'" *Wagoner v. Commonwealth*, 289 Va. 476, 487 (2015) (quoting Code § 8.01-680). The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

B. *The trial court did not err in denying Simandl's motions to strike Jurors 9 and 61 for cause.*

Simandl contends that the trial court abused its discretion by not striking Juror 9 and Juror 61 for cause. In support, he claims that Juror 9 had obtained prejudicial knowledge concerning the case and that Juror 61 was biased as a result of her acquaintances with law enforcement officers. We disagree.

It is "manifest error" for a trial court to refuse to strike a juror for cause if the juror "cannot or will not lay aside his or her preconceived opinion." *Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017). "The standard to be applied by a trial court in deciding whether to

exclude or retain a prospective juror is whether the prospective juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Breard v. Commonwealth*, 248 Va. 68, 77 (1994) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)). But "[o]n review of a court's decision to deny motions to strike for cause, appellate courts 'must give deference to the circuit court's determination whether to exclude a prospective juror because that court was able to see and hear each member of the venire respond to questions posed.'" *Keepers*, 72 Va. App. at 42 (quoting *Green v. Commonwealth*, 262 Va. 105, 115 (2001)). Accordingly, "[j]uror impartiality is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal." *Huguely v. Commonwealth*, 63 Va. App. 92, 121 (2014) (citations omitted).

Here, Juror 9 stated that she had previously heard about the case "[w]hen it happened" and "hear[d] that potentially it would be the case" for which she would serve after subsequently mentioning to others that she had jury duty. Simandl claims that Juror 9 "may have received inadmissible information or opinion about the case during her conversations with community members." However, Juror 9 assuaged these concerns based upon her responses during voir dire.

Even though she had previously heard about the case, she agreed that "the evidence in this case is just what comes into evidence in this courtroom." And contrary to Simandl's contention, Juror 9 confirmed that she understood that up to that point, no evidence "ha[d] been presented yet," meaning she knew her prior knowledge was not evidence. Taken together, while Juror 9 heard about the case prior to trial, she evinced a willingness to set aside any information she may have heard going into the trial and render a verdict solely on the evidence presented at trial. She also affirmed bedrock principles of criminal procedure: that the Commonwealth bore the burden to prove Simandl's guilt beyond a reasonable doubt and that Simandl did not have to

- 11 -

present evidence of his innocence.  So, we cannot find that the trial court, with regard to Juror 9, committed manifest error when refusing to strike Juror 9 for cause.

Simandl's claim pertaining to Juror 61 fares no better.  Juror 61 stated during voir dire that she was familiar with several of the witnesses, was close with a school resource officer, and had an extended family member employed in law enforcement.  Simandl contends that such "extensive contacts in local law enforcement" would "erode public confidence in the jury process[] and in the courts generally."  We disagree.

"A person is not automatically excluded from a jury because of an association with law enforcement personnel, provided [she] demonstrates that [she] can be impartial."  *Gray v. Commonwealth*, 233 Va. 313, 338 (1987).  Juror 61 stated that her familiarity with witnesses would not impair her ability to be impartial.  And while there are some "*per se* disqualification[s] of certain jurors in order to maintain *public confidence* in the judicial system" pertaining to familial relationships, those are not at issue here.  *Mayfield v. Commonwealth*, 59 Va. App. 839, 846 (2012); *see Townsend*, 270 Va. at 331 (recognizing that a juror sitting while his brother testified as a witness "would so likely erode the citizenry's confidence in the fairness of the judicial system that a new trial was required").  Ultimately, after giving deference to the trial court's factual findings, we cannot say that Juror 61 could not, or would not, set aside any "preconceived opinion," *Taylor*, 67 Va. App. at 456, or "erode the citizenry's confidence in the fairness of the judicial system," *Townsend*, 270 Va. at 331.  Therefore, the trial court did not commit manifest error by denying Simandl's motion to exclude Juror 61 for cause.  *Keepers*, 72 Va. App. at 43.

Accordingly, we affirm the trial court's refusal to strike Juror 9 and Juror 61 for cause.

C. *The trial court did not err in permitting Siewert to testify as an expert.*

Simandl also claims that the trial court erred by allowing Siewert to testify as an expert over his objection because the data in the spreadsheets did not require expert testimony to be understood by the jury.[5] We disagree.

In Virginia, expert testimony in a criminal matter is admissible if: 1) "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; and 2) "the court finds that the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702. "[E]xpert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible." *Payne v. Commonwealth*, 65 Va. App. 194, 221 (2015) (quoting *Coppola v. Commonwealth*, 220 Va. 243, 252 (1979)).

Here, assuming without deciding that Simandl preserved his challenge to Siewert's expert qualifications,[6] the trial court did not err by permitting Siewert to testify as an expert. The spreadsheets contained technical details addressing account information and the functions of the system's cameras. It also included a detailed log that identified recently deleted video files, as well as the name of the camera associated with each recording, the length of each recording, the file size of each deleted file, and the device used to delete them. The spreadsheets also delineated, through technical labels, devices that were associated with Simandl's Blink account

---

[5] On brief, Simandl argues that Siewert did not have sufficient specific experience with the Blink security camera system to be qualified as an expert to interpret its data. But this argument was not presented to the trial court, so it is waived. *See* Rule 5A:18.

[6] This Court "may 'assume without deciding' that the issue can be reviewed provided that this permits us to resolve the appeal on the best and narrowest grounds." *McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018).

and whether they were active on the day of the shooting. And this information was decentralized into several spreadsheets—and further separated into several pages *within* those spreadsheets—that required synthesizing many technical details to articulate that Simandl deleted the footage on the day of the shooting. Siewert's background and knowledge allowed the jury to "comprehend" the subject matter and assisted them in understanding the technical spreadsheets generated from the multiple cameras in Simandl's home. Va. R. Evid. 2:702.

Accordingly, we hold that Simandl fails to show that the trial court abused its discretion by allowing Siewert to testify as an expert with respect to the account information contained in the spreadsheets.

D. *The evidence was sufficient to convict Simandl of first-degree murder.*

Finally, Simandl claims that the evidence was insufficient to convict him of first-degree murder because the evidence failed to adequately prove premeditation. We disagree.[7]

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second[-]degree murder." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "In order to show a willful, deliberate, premeditated killing, '[t]he intention to kill need not exist for any specified length of time prior to the actual killing.'" *Cappe v. Commonwealth*, 79 Va. App. 387, 399 (2024) (alteration in original) (quoting *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984)); *see also Avent*, 279 Va. at 208 (same). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Cappe*, 79 Va. App. at 399. "In

---

[7] Simandl also assigns error on the grounds that the evidence was insufficient to establish malice or overcome his assertion of self-defense. But on brief, Simandl concedes that he "did not make any specific argument as to the sufficiency of the evidence to overcome the assertion of self-defense or to establish malice." He also does not assert any exceptions for his failure to raise these issues below. Accordingly, Simandl has waived any argument that the evidence was insufficient "to overcome the assertion of self-defense or to establish malice." *See* Rule 5A:18.

fact, under Virginia law, 'an intent to kill may be formed at the moment of the commission of the unlawful act.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

Courts also recognize that "[p]remeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient." *Id.* (quoting *Betancourt v. Commonwealth*, 26 Va. App. 363, 373 (1998)). And crucially, "circumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000).

Here, the evidence presented at trial supports an inference that Simandl acted with premeditation. By crediting the recovered evidence, Lisa's testimony, and Justice's account, the jury reasonably could have found that Simandl pursued Jay as he got back in his truck and shot at him, first striking the driver's side door. The lack of additional damage to the driver's door, and the location of Jay's injuries, also would have permitted the jury to infer that Simandl opened the truck door and fired his pistol repeatedly at Jay—an unarmed stranger—with no warning or provocation, killing him. *See Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994) ("[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation.").

The jury also could have found that Simandl was not honest about the circumstances of the shooting, including his contention that he never opened the driver's side door, and instead could have concluded that he was "lying to conceal his guilt." *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)). The jury could also have found that Simandl had exclusive access to the Blink security camera system through his email account and mobile telephone, infer that Simandl attempted to conceal

video evidence of his wrongdoing, and consider those actions as affirmative evidence of his premeditation. *Cappe*, 79 Va. App. at 400. Finally, the jury could have found that Simandl's other actions after the shooting, including his failure to call 911 and his demonstrated hostility to the police, showed a lack of remorse over his wrongdoing. *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982) (noting that a defendant's "lack of remorse" supported "whether premeditation and deliberation exist").

Simandl also contends that the jury should not have believed Justice, particularly when Justice testified that Jay and Justice were unarmed.[8] But his argument depends on his own interpretation of one portion of Justice's testimony. As such, Simandl's argument is flawed in two ways: 1) his interpretation is inconsistent with the evidence at the scene; and 2) the jury was not bound to view the evidence as Simandl sees it. "An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not. This remains so even when the factfinder *could* have found those facts or drawn those inferences but, exercising its factfinding role, elected not to do so." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).

In short, the record supports the jury's factual finding that Simandl's actions were premeditated. Accordingly, the record further supports the trial court's decision to deny the

---

[8] Simandl also contends that Justice's testimony is "impossible" because it is "entirely inconsistent with the forensic evidence" and is therefore "inherently incredible." He did not make that argument in his motions to strike the evidence or to set aside the verdict, and it therefore is waived. Rule 5A:18; *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) ("Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011))).

motion to set aside the verdict because the evidence was sufficient to support Simandl's

convictions.[9]

### III. CONCLUSION

The trial court did not abuse its discretion by denying Simandl's motion to strike two

jurors for cause or by allowing limited expert testimony. The trial court also did not err when it

denied Simandl's motion to set aside the verdict on the grounds that there was insufficient

evidence to support his convictions. For these reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[9] Finally, Simandl claims that the trial court erred by denying his motion to set aside the jury verdict because the evidence was insufficient to support his conviction for aggravated malicious wounding. But his argument on brief is comprised of three sentences, and none of them are associated with case or record citations. "We hold that [Simandl's] argument is waived due to his failure to provide the Court with the substantive legal framework through which to evaluate this assignment of error." *Moore v. Commonwealth*, 85 Va. App. 634, 639 n.3 (2025) (holding that Rule 5A:20(e) bars appellate review when an appellant cites to no cases in support of their argument).