Present:  Hassell, C.J., Lacy, Keenan, Koontz, and Lemons, JJ., and Compton and Russell, S.JJ.

DANNY R. HOLLEY                          OPINION BY
                                  SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 042275                  June 9, 2005

DANIEL J. PAMBIANCO, M.D., ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                    Paul F. Sheridan, Judge Designate


     This appeal in a medical malpractice case concerns the admissibility of evidence tending to prove the inherent risks of the treatment that led to the plaintiff's injury.

*Facts*

     On November 28, 2000, Danny R. Holley was admitted to Martha Jefferson Hospital in Charlottesville as an outpatient to undergo a scheduled colonoscopy to be performed by Daniel J. Pambianco, M.D., a gastroenterologist.  During the colonoscopic examination, Dr. Pambianco discovered two sessile polyps in the colon, each about one centimeter in diameter. He removed both of them by a "hot biopsy forcep[s]" technique in which forceps, threaded through the colonoscope tube, carry an electric current to the site in order to cauterize the tissue.[1]

_____

     [1] The record shows that a "colonoscopy" is a procedure whereby a "colonoscope," a flexible device containing a light source, a series of lenses, and a facility to insert air to distend the colon and fluids to wash the lenses, is inserted into the colon to permit a thorough examination of its

Holley was driven home by his wife after the procedure and went to bed. That night he was unable to eat or drink and suffered abdominal distension and soreness. The next day, he called Dr. Pambianco's office, describing his symptoms. A nurse told him that his symptoms were normal and that he should walk. Later that day, the nurse called him and advised him to keep walking, to drink hot tea and to take a prescription that she would call in to his pharmacy. His symptoms grew worse and on December 3, five days after the operation, he called Dr. Pambianco's office again, describing his condition. This time, Dr. Byrd S. Leavell, a colleague of Dr. Pambianco, returned his call and told him to report immediately to the emergency room at the hospital. Upon examination, he was found to have a perforated colon leaking into the abdominal cavity, causing peritonitis. He was given a colostomy and spent ten days in the hospital, seven of them in intensive care. He was released with a colostomy bag attached to his side. Several months later, he underwent a

interior walls. The instrument also contains a channel through which surgical instruments may be introduced into the colon. "Polyps," sometimes found attached to the interior colon walls, are abnormal growths protruding inward. Because they may be or become cancerous, they are removed, if possible, during a colonoscopic procedure. Such a removal is called a "polypectomy." Polyps may either be "pedunculated" (attached to the colon wall by a narrow stem and more easily removed) or "sessile" (having a broad base attached to the colon wall).

third operation to close the colostomy and restore the continuity of the colon.

*Proceedings*

Holley brought this medical malpractice action against Dr. Pambianco and the medical group of which he was a member. The case was tried before a jury and resulted in a verdict for the defendants. We awarded Holley an appeal limited to two issues: (1) Whether the trial court erred by admitting evidence of the risks of perforation of the colon during a colonoscopy and polypectomy and permitting defense counsel to argue to the jury, in a case in which informed consent was not in issue, that such risks were normal, and (2) whether the trial court erred by refusing to instruct the jury that Dr. Pambianco's failure to give the plaintiff discharge instructions constituted negligence per se.

In pretrial proceedings, the parties agreed that no evidence or argument would be permitted with regard to a lack of informed consent and the court entered an order to that effect. Holley filed a motion in limine, requesting the court to preclude the admission of any evidence concerning the known risks of colonoscopy and polypectomy, any discussion of such risks with him, and whether he had any awareness of the risks. Holley relied on our recent decision in Wright v. Kaye, 267 Va. 510, 593 S.E.2d 307 (2004). There, we held that where a

3

lack of informed consent is not in issue in a medical malpractice case, evidence of information given to the patient concerning the risks of surgery is irrelevant to the sole issue in the case: Whether the physician departed from the standard of care. We observed that such evidence "could only serve to confuse the jury because the jury could conclude . . . that consent to the surgery was tantamount to consent to the injury. . . ." Id. at 528-29, 593 S.E.2d at 317.

Dr. Pambianco responded by pointing out a difference between Wright and the present case. In Wright, the patient's conduct after surgery was not in issue. Here, the defense contends that Holley, having been informed of the risks of perforation of the colon, had a duty to mitigate his damages by making prompt report of his post-operative symptoms and that his four-day delay in doing so greatly exacerbated his injuries. The defense informed the court that the evidence would support jury instructions on both mitigation of damages and contributory negligence.[2]

The court took the question under advisement and ultimately ruled that the evidence would be admitted only for the limited purpose of the defendants' contentions concerning

_____

[2] The defense ultimately decided not to ask for an instruction on contributory negligence. The court did give the jury an instruction covering the plaintiff's duty to "minimize" his damages.

4

mitigation of damages and contributory negligence.  The court

stated that jury instructions would ensure that the jury would

not consider such evidence in connection with the plaintiff's

contention that the physician had departed from the standard

of care.[3]

At trial, Holley introduced an expert witness who

testified that there are inherent risks in the use of a "hot

biopsy forceps" technique in the removal of sessile polyps

because the electric current sufficient to remove the polyp

tissue may also be strong enough to burn a hole in the wall of

the colon, particularly in areas where the colon wall is thin.

It was his opinion that Dr. Pambianco had departed from the

applicable standard of care by using that technique to remove

polyps in the transverse colon, where the wall is typically

thin, and that in the circumstances of this case, the standard

would have required use of a "cold biopsy technique" instead,

---

[3] The court gave the following instruction:

"During this trial, evidence was introduced
that Mr. Holley may have received information about
the risks associated with his colonoscopy.  Whether
or not Mr. Holley received such information is only
relevant to the issue of whether Mr. Holley used
ordinary care to mitigate his damages.  You may not
consider that evidence on the issue of whether
defendants breached the applicable standard of care.
By consenting to the surgery, Mr. Holley did not
consent to any adverse consequences, known or
unknown."

whereby the polyps would be removed surgically, in small pieces, without using an electric current.

In cross-examination of the plaintiff's expert witness, defense counsel elicited the statistical frequency of perforations of the colon wall during all colonoscopies and polypectomies. The court overruled the plaintiff's objection to this testimony. The witness stated that perforations occur at the rate of 1 per 10,000 in colonoscopies and 13 per 10,000 in polypectomies. During the defendants' case, defense counsel elicited similar testimony from Dr. Pambianco and each of the two expert witnesses called in his behalf, although all gave differing numbers. Each of the three expert witnesses, however, in response to questioning by plaintiff's counsel, testified that the statistics contained no breakdown between those cases involving perforations caused by negligence and those that did not.

Over plaintiff's objection, defense counsel, in his closing argument to the jury, referred to this testimony in the context of the standard of care: "I'm arguing statistics. . . . [T]hat risk factor cannot be taken out of the procedure. You can do everything exactly the way you're supposed to do it, and you can be absolutely prudent, absolutely careful and we still have a situation like that that occurred with Mr. Holley."

*Analysis*

That argument, and the statistical evidence on which it was based, had nothing to do with the issue of mitigation of damages.  Its admission was error for the reasons discussed in Wright.

Further, the argument was based upon a premise unsupported by the evidence:  That perforations are just as likely to occur in the absence of negligence as in its presence.  The statistical evidence was so misleading that, for all the jury could determine, each of the perforations of the colon contained in the statistics may have been due to a physician's negligence.  In that event, the jury could infer the direct opposite of defense counsel's argument:  That perforations occur only where the physician is negligent.  See McCloud v. Commonwealth, 269 Va. 242, 259, 609 S.E.2d 16, 25 (2005) (evidence of a raw number of events, without describing their circumstances, can be misleading or confusing to the jury); Sanitary Grocery Co. v. Steinbrecher, 183 Va. 495, 499–500, 32 S.E.2d 685, 686-87 (1945) (evidence that 1,000 customers per day visited grocery store without injury inadmissible as misleading and throwing no light upon the facts of the case before the jury).  We conclude that such raw statistical evidence is not probative of any issue in a medical malpractice case and should not be admitted.

Because the case must be remanded, we will discuss other issues that may arise in any further proceedings in the trial court. The trial court did not err in ruling that the defense had the right to attempt to prove that the plaintiff had failed to mitigate his damages. See Sawyer v. Comerci, 264 Va. 68, 76-77, 563 S.E.2d 748, 753 (2002). In that connection, the defense had the right to adduce competent evidence that Holley had been warned of the danger of complications that might result from his surgery, of the symptoms that would signal such complications, and of the need to make prompt report of any such symptoms in order that appropriate and timely remedial steps could be taken. The jury would be entitled to consider any failure or undue delay on his part in doing so, in the light of his condition at the time.

The evidence offered at trial in support of that defense included a videotape shown to Holley in Dr. Pambianco's office about six weeks before his colonoscopy. Prepared by the American Gastroenterological Association, the tape was less than 10 minutes in length and was designed to be shown to patients contemplating future colonoscopy. Generally reassuring in tone, the tape contained only two caveats upon which the defense relied:

Although colonoscopy is a safe procedure, complications can occur rarely. These include perforation; that is, puncture of the colon wall which could require surgical repair.

. . . .

Occasionally minor problems may persist, such as bloating, gas or mild cramping. These should disappear in 24 hours or less.[4]

The foregoing language contains no warning to the patient that a burden was being imposed upon him to take any post-operative steps for his own protection. Its reassuring tone was more conducive to the opposite conclusion: That the procedure was "safe," that complications occur "rarely," that post-operative problems persist only "occasionally," and that if they do they "should disappear in 24 hours or less." It had no tendency to prove that Holley had failed to mitigate his damages and its admission was error.

In further support of their defense of failure to mitigate damages, the defendants relied on certain post-operative instructions allegedly given by hospital personnel

---

[4] By his motion in limine, Holley sought exclusion of the entire tape as unrelated to the issue of the standard of care. The defense asked for admission only of that portion of the tape containing the language quoted above, as relevant to the issue of mitigation of damages. The trial court denied Holley's motion and ruled that the portion sought by the defense would be admitted, but advised counsel that the entire tape would be admitted, if Holley so desired, for the sake of completeness. Ultimately, Holley chose that alternative and the entire tape was shown to the jury.

to Holley's wife[5] and on the content of his two telephone conversations with Dr. Pambianco's nurse on the day after his surgery. These matters were probative as to the defense of mitigation of damages and the trial court did not err in admitting them. Their weight and sufficiency, of course, were issues for the jury, which was entitled to consider their content, their timing, and the patient's ability to comprehend them. See Lawrence v. Wirth, 226 Va. 408, 412-13, 309 S.E.2d 315, 317 (1983).

---

[5] There was a conflict in the evidence whether Holley received post-operative instructions. He and his wife testified that they did not recall receiving them. The defendants relied on the standard discharge instructions traditionally given at the hospital after colonoscopy procedures. The plaintiff argued that no reference was made to such instructions in his hospital chart and that therefore the court should hold that none were given and that this failure on Dr. Pambianco's part constituted negligence per se. The defense failed to produce any discharge instructions in response to discovery, having received none in response to a subpoena of the hospital's records. On the evening before trial, Dr. Pambianco visited the hospital and found a form, signed by Holley, acknowledging receipt of discharge instructions. The court refused to admit the form into evidence at trial because of the lateness of its production, but Holley's counsel stated that Holley agreed that the signature on it was his. The court instructed the jury: "A physician who has performed surgery has a duty to have his patient receive post[-]operative instructions." The court refused plaintiff's proposed instruction stating that the physician's failure to give discharge instructions would constitute negligence per se. The court correctly ruled that the question whether discharge instructions were actually given was an issue of fact for the jury. Because the peculiar factual circumstances of the trial, especially the timing of the production of the hospital form, are unlikely to reoccur

*Conclusion*

For the reasons stated above, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

---

in any future proceedings, we do not reach the assignment of error relating to these instructions.