Present: Hassell, C.J., Lacy, Keenan, Kinser, Lemons, and
Agee, JJ., and Carrico, S.J.

RIVERSIDE HOSPITAL, INC., t/a
RIVERSIDE REGIONAL MEDICAL
CENTER, ET AL.

v.  Record No. 060392    OPINION BY JUSTICE ELIZABETH B. LACY
                                    November 3, 2006

TERRY ALLAN JOHNSON, EXECUTOR
OF THE ESTATE OF ELAINE DUDLEY
JOHNSON, DECEASED

        FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                     David F. Pugh, Judge

     Terry Allan Johnson, the executor of the estate of Elaine

Dudley Johnson (the Estate), filed a motion for judgment

against Riverside Regional Medical Center (Riverside) and its

employee Nurse Nicole Green[1] alleging that the defendants

failed to accurately assess Elaine Dudley Johnson's risk of

falling and then failed to institute appropriate measures to

prevent her from falling.  A jury returned a verdict in favor

of the Estate.  In this appeal, Riverside and Nurse Green (the

Defendants) challenge four of the trial court's evidentiary

rulings and a jury instruction.  For the reasons set out

below, we conclude that there was no error in the trial

court's rulings and, consequently, we will affirm the judgment

of the trial court.

_____

     [1] At the time of trial, Nicole Green was identified as
Nicole Green Miles.  For purposes of this opinion we will
refer to her as Nicole Green or Nurse Green.

FACTS

Seventy-nine year old Johnson was admitted to Riverside for "profound generalized weakness and new-onset confusion, disorientation, hallucinations and agitation," and dehydration.  Johnson suffered from lymphoma, which had been diagnosed ten years earlier.  Riverside staff completed an "Adult Data Base" form, which listed pertinent information about Johnson's medical history and condition.  The form also contained an assessment of Johnson's risk of falling based on several factors.  Johnson was not identified as a high fall-risk patient, and no fall prevention procedures were initiated for her.

Nurse Green testified that on October 31, 1997, she placed a call bell within Johnson's reach and that the top rails were in place on Johnson's bed.  Green did not install a bed alarm, which would have sounded had Johnson gotten out of bed unassisted.  Rather, Green testified that she instructed Johnson not to get out of bed without assistance, but to use the call system to request assistance in getting up.

Sometime after 10:00 p.m. on October 31, 1997, Johnson fell in the hallway outside her room.  After the fall, Johnson complained of pain in her left hip.  An x-ray on November 1, 1997 revealed that Johnson's left hip was fractured.

Several months later, Johnson died of lymphoma.  The Estate filed suit against Nurse Green and Riverside, seeking $1 million in compensatory damages and $350,000 in punitive damages.  In the Motion for Judgment, the Estate alleged that although Riverside was aware of numerous patient falls, it failed to "implement restraints, bottom bed rails or even a bed check alarm" for Johnson.  The Estate further alleged that Riverside was negligent in, inter alia, failing to (1) assess Johnson as a high fall-risk patient; (2) initiate a fall prevention plan; and (3) utilize a prompt and reliable nurse call system.

The Estate nonsuited the punitive damages claim following the close of evidence.  A jury returned a verdict for the Estate and against Nurse Green and Riverside in the amount of $1 million, with interest from October 31, 1997.  The court removed the interest award and entered a $1 million judgment for the Estate.

The Defendants timely filed this appeal, raising five assignments of error challenging the trial court's rulings primarily related to the admission of evidence.  The Defendants claim the trial court erred in admitting statistical evidence concerning patient falls at other, non-party institutions and previous patient falls at Riverside Hospital, in admitting evidence of Riverside Hospital's staff-orientation instructions

3

and nurse training materials from non-party Riverside School of Professional Nursing, in admitting privileged communications and reports, and in limiting testimony of the Defendants' standard of care expert.  The Defendants also claim that the trial court erred in submitting a jury instruction containing an incorrect statement of law.  We will consider these issues in order.

## DISCUSSION

### I.  ADMISSION OF STATISTICAL EVIDENCE

In their first assignment of error, the Defendants challenge the trial court's decision to admit statistical evidence consisting of information from bar graphs contained in a nursing journal article and information kept and compiled by Riverside regarding other patient fall cases at Riverside. Our review of the record, as discussed below, shows that the Defendants failed to preserve their objections to this evidence.

### A.  BAR GRAPH CHARTS

During opening statements, the Estate showed the jury bar graphs displaying various information about patient falls in the general hospital population, and referred to the information on the graphs.  The Defendants objected, stating that although the graphs could be properly relied on by experts and read to the jury pursuant to Code § 8.01-401.1,

4

the graphs and articles were "not evidence and [it was] certainly impermissible to argue to the jury statistics in this case." The trial court overruled the objection.

Nurse Wendy E. Jenvey, the Estate's expert witness, then testified that the journal article containing the bar graphs was the type of source normally relied upon by others in the nursing field to form opinions, and that she considered the article to be a reliable authority. Jenvey described the content of the article and the graphs to the jury. The Defendants did not object to this testimony. The Estate again referred to information in the bar graphs during closing argument, again without any objection from the Defendants. Although shown to the jury, neither the journal article nor the bar graphs were introduced into evidence.

In the absence of any objection to the bar graph references during Jenvey's testimony or closing arguments, only the Estate's reference to the bar graphs made in opening argument is before us in this assignment of error. Rule 5:25. In objecting to statements made in the opening argument, the Defendants argued that the bar graphs and journal article were "not evidence" and that arguing such statistics to the jury was "impermissible." The assignment of error challenges the admission of evidence; however an opening statement is argument of counsel, and does not involve admission of

5

evidence.  To the extent the assignment of error addresses the propriety of the Estate's argument and the trial court's determination that including reference to the bar graphs was permissible, that ruling, if error, is harmless error.  As the record reflects, the jury heard the same information during Jenvey's testimony without objection.

B.  RIVERSIDE HOSPITAL PATIENT FALL REPORTS

The Defendants next contend that the trial court erred in admitting statistical evidence about other patient falls at Riverside (the Fall Evidence).  This evidence consisted of testimony based on a report generated by Riverside listing patient fall data from January through October 1997.

In a pre-trial motion in limine, the Defendants argued that this information was irrelevant, prejudicial, and likely to confuse and mislead the jury.  The Estate countered that the information was relevant to establishing notice under the punitive damage claim.  The trial court agreed with the Estate and ruled that patient falls which took place after the patient had gotten out of bed were similar to Johnson's fall, and that data about those falls was admissible for purposes of notice for the punitive damage claim.  The trial court suggested that a cautionary instruction could be given to the jury to clarify the purpose of such information.

6

At the close of evidence, the Estate nonsuited the claim for punitive damages. The Defendants did not renew their objection to the Fall Evidence on the basis of relevance, and did not ask for any cautionary jury instruction regarding consideration of the Fall Evidence. The Estate maintains that the Defendants waived their objection to the Fall Evidence because they did not renew their relevancy objection following the nonsuit of the punitive damage claim. The Defendants contend that once they noted their exception to the denial of their motion in limine, they were not obligated to renew their objection to the Fall Evidence.

The purpose of Rule 5:25 is to afford the trial court the ability to address an issue. If that opportunity is not presented to the trial court, there is no ruling by the trial court on the issue, and thus no basis for review or action by this Court on appeal. Furthermore, Rule 5:25 requires that parties state objections with "reasonable certainty." See Fisher v. Commonwealth, 236 Va. 403, 413-14, 374 S.E.2d 46, 52 (1988) (holding defendant had waived objection pursuant to Rule 5:25 by offering a general objection that "failed to put the trial court on fair notice").

In this case, the Defendants, in their pre-trial motions and during Friend's testimony, clearly objected to the admission of the Fall Evidence as irrelevant, immaterial and

7

confusing or prejudicial to either the issue of notice or negligence. The trial court allowed the Fall Evidence for the purpose of notice; however, the punitive damage claim ultimately was not presented to the jury. Although the Defendants are correct that they did not have to renew their objection to the introduction of the Fall Evidence as it related to the notice claim,[2] under the circumstances of this case, we conclude that the Defendants' failure to reassert their objection that the Fall Evidence was irrelevant to the issue of negligence, or to ask the trial court to give the jury a cautionary instruction regarding the use of such evidence, precluded the trial court from considering whether further action or ruling should be made regarding that evidence after the Estate's punitive damages claim was nonsuited.

In Riner v. Commonwealth, 268 Va. 296, 601 S.E.2d 555 (2004), the defendant did not object when the trial court took defendant's pre-trial motion for change of venue under advisement. We held that because the defendant did not renew

---

[2] The punitive damage claim was not submitted to the jury. Therefore, a ruling by this Court on whether the admission of the evidence for purposes of notice was error would be an advisory opinion because our ruling would not have any effect on the verdict that was rendered. This Court does not issue advisory opinions. Commonwealth v. Harley, 256 Va. 216, 219, 504 S.E.2d 852, 854 (1998); City of Fairfax v. Shanklin, 205 Va. 227, 229-30, 135 S.E.2d 773, 775-76 (1964).

8

the motion or remind the court that the motion was still pending prior to the seating of the jury, the change of venue motion was waived and could not be raised on appeal. Id. at 309-310, 601 S.E.2d at 562-63.

In this case, while the trial court did not take under advisement the Defendants' objection to the admission of the Fall Evidence as irrelevant and prejudicial to the negligence issue, the court also did not specifically address this objection in ruling that the evidence could be admitted for the limited purpose of notice in connection with the punitive damage claim.[3]  When the punitive damage claim was nonsuited, the complexion of the litigation changed significantly.  The Defendants recognized this change and sought to strike portions of the motion for judgment relating to the punitive damage claim and co-authored a joint statement read to the jury explaining that punitive or exemplary damages were no longer part of the litigation.  They took no steps, however, to bring to the attention of the trial court the irrelevance of the Fall Evidence in light of the changed circumstances of the case, nor did they seek a cautionary instruction regarding

---

[3] Implicit in the limitation of the use of the Fall Evidence to the notice issue, is the proposition that the evidence was not relevant to other issues.  However, Defendants have characterized the trial court's ruling as denying their objection to the evidence with regard to the negligence issue.

9

the jury's use of that evidence.  Thus, as in Riner, the Defendants did not afford the trial court in this case an opportunity to rule on their objections to the Fall Evidence in the sole context of the negligence issue.

We reject the Defendants' argument that they renewed their relevance objection by moving to strike portions of the Motion for Judgment affected by the nonsuit.  Nothing in this motion referred to either the statistical evidence of which they now complain or to its relevance to the negligence count. Thus, this motion also fails to meet the "reasonable certainty" requirement contained in Rule 5:25.

For these reasons we conclude that the Defendants did not preserve their objections to the statistical evidence involving patient falls at other hospitals and at Riverside Hospital and we will not consider this assignment of error further.  Rule 5:25.

## II.  ADMISSION OF ORIENTATION INSTRUCTIONS AND NURSE TRAINING MATERIALS

The Defendants next assign error to the trial court's decision to admit evidence of Riverside's staff orientation instructions and nurse training materials from the Riverside School of Professional Nursing.

In pre-trial motions, the Estate sought discovery of Riverside orientation materials on high fall-risk assessment

10

or prevention and nurse training materials on that subject from Riverside School of Professional Nursing, arguing such information was relevant to notice under the punitive damage claim and to the standard of care. The trial court granted the Estate's motions to compel over the Defendants' objection.

Following discovery, the Defendants filed a motion in limine again arguing that the orientation material and nursing school curriculum should not be admitted because they constituted private rules which cannot establish the standard of care, were otherwise irrelevant, and would be confusing to the jury. In response, the Estate asserted that these materials were not policies and procedures of the hospital, and would not be offered as the standard of care. The Estate maintained that standard of care testimony would come only from an expert, that the materials were relevant as establishing education, and would be "corroborative" of the expert's standard of care testimony. The trial court denied the Defendants' motion in limine.

At trial, the Defendants again objected to the admission of the orientation and nursing school curriculum evidence when offered through the testimony of Flo A. Hicks and Debra Sullivan-Yates, respectively. The Estate again asserted that the evidence was not introduced as the standard of care, but

11

as foundation and corroboration of its expert's testimony.[4] The trial court allowed the testimony of both witnesses.

We review a trial court's evidentiary rulings applying an abuse of discretion standard.  We will not overturn a trial court's exercise of its discretion in determining whether to admit or exclude evidence on appeal unless the evidence shows that the trial court abused its discretion.  Hinkley v. Koehler, 269 Va. 82, 91, 606 S.E.2d 803, 808 (2005).  While a "trial court has no discretion to admit clearly inadmissible evidence," Norfolk & Western Ry. Co. v. Puryear, 250 Va. 559, 563, 463 S.E.2d 442, 444 (1995) (quoting Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986)), "a great deal must necessarily be left to the discretion of the court of trial, in determining whether evidence is relevant to the issue or not."  Peacock Buick, Inc. v. Durkin, 221 Va. 1133, 1136, 277 S.E.2d 225, 227 (1981) (internal quotation marks omitted).

We first address the Defendants' arguments that, pursuant to Virginia Ry. & Power Co. v. Godsey, 117 Va. 167, 83 S.E. 1072 (1915) and Pullen v. Nickens, 226 Va. 342, 310 S.E.2d 452 (1983), the evidence at issue was inadmissible because it

_____

[4] The Defendants also argued that the material was inadmissible because there was no evidence that Nurse Green attended the Riverside School of Nursing or that she saw the

12

served as private rules, which cannot establish the standard of care. We reject this argument for two reasons. First, Godsey and Pullen involved policies and procedures that employees were expected to follow and as such were described as "private rules." Godsey, 117 Va. at 168-70, 83 S.E. at 1072-73; Pullen, 226 Va. at 349-51, 310 S.E.2d at 456-57. In this case, the evidence of the staff orientation instruction and nursing curriculum, although dealing with the issue of fall-risk assessment and prevention, were not hospital policies or procedures of the type involved in Godsey and Pullen. More importantly, it was clear throughout this proceeding that the trial court ruled, and the Estate agreed, that the evidence in question would not be admitted to establish the standard of care. That limitation was repeated during the admission of the evidence and the jury was instructed that the standard of care for Nurse Green's actions could be established only through expert testimony.

In addition, the Estate's expert witness, Jenvey, testified that the orientation material and nursing instruction were among the materials she consulted in formulating her opinion on the standard of care. The Defendants did not object to Jenvey's reference to and

orientation video. In light of our disposition of this issue, we need not address that objection.

13

reliance on this evidence.[5]  Furthermore, Nurse Green, who

testified after Hicks and Sullivan-Yates, and before Jenvey,

stated that she had attended the Riverside orientation,

described the contents of the orientation, and testified that

her nursing education entailed a "general nursing curriculum."

Considering this record, we cannot say the trial court

abused its discretion in admitting evidence of Riverside's

orientation materials and the nursing school curriculum on

high fall-risk assessment and prevention.  Under the trial

court's rulings, the evidence at issue was not offered to

establish the standard of care.  Rather, the jury was

instructed to rely on the expert testimony regarding the

standard of care.  There was no objection to the relevancy of

the evidence when the Estate's expert testified she referred

to it in formulating her opinion on the standard of care, and

similar evidence was admitted through the testimony of Nurse

Green.

### III.  ADMISSION OF QUALITY CARE CONTROL REPORT AND INFORMATION FROM HOSPITAL FALL DATABASE

We next turn to the Defendants' contention that the trial

court erred in admitting into evidence certain reports made

and maintained by Riverside because they were privileged

---

[5] The Defendants' only objection to this testimony was
that some of the materials Jenvey identified as credible

documents pursuant to Code § 8.01-581.17. Over the Defendants'

objection, the trial court admitted into evidence a document

which Riverside termed a Quality Care Control Report (QCCR).

This report consists of a form onto which Green had entered

information about Johnson's fall. In the blocks provided,

Green indicated the date, place, and time of the fall, the

severity of the fall, the facts of the fall, whether the

patient was aware of the fall and her reaction to it, and her

status before the fall including the use of any restraints,

side rails, or call bell. The trial court also admitted a

redacted page from Riverside's Quality Management Services

(QMS) database report. This page contained entries about

Johnson's fall, as well as that of a 61 year-old Riverside

patient who fell the same day as Johnson.[6]

Joanne Friend, Riverside's Director of Risk Management,

testified that the QCCR is an incident report that Green

---

authority for determining the standard of care were not
contained in the designation submitted pre-trial.

[6] The entry about Johnson stated in relevant part:
"Patient was found on the floor in the hallway; had
gotten OOB [out of bed] without assistance –
unsteady gait/confused. Patient c/o left hip pain
after fall." The entry about the other patient
stated: "Patient was found on the floor of the
doorway to his room with IV pole in hand. The
patient states he can't remember why he got OOB, and
he did not hurt himself. Pt. stated that he 'got
down on his L knee and crawled to the door.' . . .
ACTIONS: Bedcheck on; nurse call system down.
Patient refuses restraints . . . ."

15

prepared "in the course of her job." Such reports, Friend stated, were completed for all falls regardless of whether there was an injury or litigation was expected. Friend testified that after the QCCRs were completed, some of the information on the forms would be entered into the QMS database by an employee in Friend's office. The QCCRs were generally destroyed after three months, although Friend retained the QCCR describing Johnson's fall in anticipation of litigation. Reports were generated based on the information in the QMS database and those reports were provided to Riverside's "quality committee which was made up of administrators and physicians," and then ultimately to Riverside's board of directors. Not every report was given to the hospital's quality committee, but the information contained in the reports was always available to committee members.[7] According to Friend, QCCR's were generated for the purpose of "improvement efforts."

The Defendants argue that the information on the QCCR was a qualitative analysis of Johnson's fall and that the QMS database is a digest of QCCR forms intended to improve the delivery of healthcare at Riverside. As such, the Defendants

---

[7] It is not clear from the record whether the specific QCCR at issue was given to a peer review or quality care committee, although it is clear that some information from the

contend, the information was privileged material, exempt from disclosure under Code § 8.01-581.17.

The Estate replies that the reports at issue were actually routine accident reports that were designated as quality care control documents in an attempt to invoke the privilege afforded under Code § 8.01-581.17(B). According to Johnson, neither the QCCR nor the page from the QMS database contains any qualitative information about either fall incident, only the circumstances of the falls. Such information, the Estate argues, should not be entitled to the privilege under Code § 8.01-581.17 merely because it may be ultimately reviewed by a medical staff, quality assurance, peer review, or other type of committee identified in the statute. The incident reports or QCCR's and the database report made from those reports are medical records kept in the course of operating a hospital and thus under Subsection (C) of Code § 8.01-581.17 are not entitled to the presumption, according to the Estate.

As relevant here, Code § 8.01-581.17 provides as follows:[8]

> B.    The proceedings, minutes, records, and
> reports of any (i) medical staff committee,
> utilization review committee, . . . (iii) quality
> assurance, quality of care, or peer review

_____

QCCR would be contained in reports given to various quality review committees.
    [8] Code § 8.01-581.17 was amended in 2006 but those amendments are not relevant to the issues in this appeal.

17

committee . . ., together with all communications, both oral and written, originating in or provided to such committees . . . are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless a circuit court, after a hearing and for good cause . . . orders the disclosure of such proceedings, minutes, records, reports, or communications. . . . Oral communications regarding a specific medical incident involving patient care, made to a quality assurance, quality of care, or peer review committee established pursuant to clause (iii), shall be privileged only to the extent made more than 24 hours after the occurrence of the medical incident.

C.    Nothing in this section shall be construed as providing any privilege to health care provider . . . medical records kept with respect to any patient in the ordinary course of business of operating a hospital . . . nor to any facts or information contained in such records nor shall this section preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in the ordinary course of hospitalization of such patient.

The documents at issue are not documents generated by a peer review or other quality care committee referred to in the statute. Thus they are not proceedings, minutes, reports, or other communications "of" or "originating in" such committees. The question is whether they qualify for the privilege because they are "communications . . . provided to" such peer review or quality care committees.

A literal application of the phrase "all communications, both oral and written, . . . provided to such committees" would impress the privilege on every document and every statement made available to a committee or entity identified

18

in the statute. Such an application would allow a health care facility to immunize from disclosure every statement or document maintained by the facility simply by insuring that such statement or document was provided or available to a peer or quality review committee. Considering this phrase in the context of the entire section, however, shows that the General Assembly did not intend such a broad application of the privilege. For example, the privilege attaching to oral communications regarding a specific medical incident involving patient care is limited. Code § 8.01-581.17(B). Similarly, the section is not to "be construed" as applying the privilege to the facility's medical records of a specific patient kept in the ordinary course of operating such facility, or to evidence of a patient's treatment or hospitalization kept in the ordinary course of the patient's hospitalization. Code § 8.01-581.17(C).

These limitations on the application of the privilege are consistent with preserving the confidentiality of the quality review process while allowing disclosure of relevant information regarding specific patient care and treatment. "The obvious legislative intent [of the statute] is to promote open and frank discussion during the peer review process among health care providers in furtherance of the overall goal of improvement of the health care system. If peer review

19

information were not confidential, there would be little incentive to participate in the process." HCA Health Services of Virginia, Inc. v. Levin, 260 Va. 215, 221, 530 S.E.2d 417, 420 (2000). It is the deliberative process and the conclusions reached through that process that the General Assembly sought to protect. See Code § 8.01-581.16 (providing immunity for actions taken by persons involved in the peer review process).

The deliberative process involving evaluation of patient safety conditions and the design of initiatives to improve the health care system both necessarily begin with factual information of patient care incidents occurring within the health care facility. The use of this factual information in some way in the peer review or quality care committee process alone is insufficient to automatically cloak such information with the protection of non-disclosure. Factual patient care incident information that does not contain or reflect any committee discussion or action by the committee reviewing the information is not the type of information that must "necessarily be confidential" in order to allow participation in the peer or quality assurance review process. Rather such information is the type, contemplated by Subsection (C) of Code § 8.01-581.17, which the General Assembly has specifically instructed should not be brought within the scope

20

of those items entitled to the privilege under any other part of the section.[9]

Applying these principles, we conclude that the documents at issue here are of the nature of those described in Code § 8.01-581.17(C) and are not privileged. The QCCR, or incident report, was a written documentation of the circumstances of Johnson's fall, kept in the normal course of business. The QCCR was a factual recitation of a fall that occurred during Johnson's hospitalization and the immediate action taken when Johnson was found on the floor. Likewise, the redacted page from the QMS database report was a factual description of Johnson's fall and that of another patient which, according to Friend's testimony, was based on a QCCR. Like the QCCR, the information on this page related to the raw data about the hospitalization and treatment of specific patients.[10] Both documents were medical records of the hospital, made and kept in the normal course of the operation of the hospital. Accordingly, the trial court did not err in

---

[9] The Defendants argue that such records must be the medical chart of the specific patient. However, the statute refers to medical records of the health care facility. Thus, this provision is not limited to what is contained in the documents generally considered to be the patient's medical chart.

[10] Our consideration here is limited to the specific entries contained on this page and not to a QMS database report in general.

ruling that the documents were not privileged pursuant to the statute.

IV.   TESTIMONY OF NURSE FRANCIS A. VICKERS

At trial, the Defendants proffered Nurse Francis A. Vickers as an expert to testify about assessing patient fall-risk and risk-reducing interventions.  The Estate argued that because Vickers had not had experience in activating bed alarms, she did not fulfill the active clinical practice requirement for a testifying expert.  Code § 8.01-581.20.  The trial court agreed with the Estate and allowed Vickers to testify about fall-risk assessment and fall-risk intervention measures other than bed alarms.  The Defendants, after objecting to the court's ruling, indicated that they wished to avoid telling the jury that Nurse Vickers was not qualified to testify on bed alarms, and ultimately offered Nurse Vickers as an expert only in patient fall-risk assessment.  Nurse Vickers testified that Johnson was not a high fall-risk patient.

On appeal, the Defendants present the following assignment of error:

> The trial court erred in prohibiting defendants' standard of care expert, Nurse Francis Vickers, from testifying that Ms. Johnson did not require fall-prevention measures because she was not a high-fall-risk patient.

It is not clear from this assignment of error exactly which ruling of the trial court the Defendants challenge.  This

assignment of error does not address the limitation the trial court placed on Nurse Vickers' qualification as an expert. Nor does this assignment of error challenge Vickers' ability to testify on fall-risk assessment, because she did present such testimony. And although she did not present testimony on fall prevention measures other than bed alarms, she was entitled to do so. Furthermore, the Defendants' counsel agreed that Vickers could not be asked whether "any intervention" was necessary because a negative answer, based on Vickers' opinion that Johnson was not a high fall-risk patient, would imply that Vickers had also excluded bed alarms, a subject about which she was not qualified to testify.

On brief here, the Defendants assert that Vickers should have been allowed to testify as to the need for initiation of fall prevention measures, regardless of the nature of the types of fall prevention interventions. We do not find any ruling of the trial court, however, specifically prohibiting such testimony. Rather, the trial court ruled that the Defendants could not question Vickers about the need for "any intervention," without indicating that the question was not meant to include bed alarms. Furthermore, implicit in Nurse Vickers' opinion that Johnson was not a high fall-risk patient is the conclusion that, therefore, fall-risk prevention

measures were not necessary.  For these reasons, we reject this assignment of error.

## V.  JURY INSTRUCTIONS

In their final assignment of error, the Defendants assert that the jury verdict must be set aside because of an error of law in a jury instruction and the resulting jury confusion.

The jury received the following instructions:

Instruction 14:  The Court instructs the jury that a hospital has the duty to exercise reasonable care and attention for a patient's safety as her mental and physical condition, if known, may require.

If a hospital fails to perform this duty, then it is negligent.

Instruction 15:  The Court instructs the jury that a nurse has a duty to use the degree of skill and diligence in the care and treatment of her patient that a reasonably prudent nurse in the same field of practice or specialty in this State would have used under the circumstances of this case.  If Nurse Green and/or any other Riverside nurse failed to perform that duty . . . then each such nurse and Defendant, Riverside, is negligent.

Instruction 18:  The Court instructs the jury that you must determine the degree of care that was required of Defendant, Riverside, Nurse Green, and/or Riverside's other nurses by considering only the expert testimony on that subject.

The Defendants argue that Instruction 14 was improper because it failed to inform the jury of the correct negligence standard to be applied to a hospital in a medical malpractice case.  The Defendants claim Instruction 14 improperly told the jury to determine the standard of care based on common

24

knowledge.  Rather, the standard of care should be determined by expert testimony on the issue.  Perdieu v. Blackstone Family Practice Ctr., 264 Va. 408, 422, 568 S.E.2d 703, 711 (2002) ("Furthermore, the appropriate standard of care required by a nursing home to prevent falls by residents is not within the common knowledge or understanding of a jury.").

The Defendants further argue that Instruction 14 misled and confused the jury.  During deliberations, the jury asked if it could find the hospital negligent without finding Nurse Green negligent.  The Defendants claim that the jury's question evidences confusion as to the interplay between Instruction 14 and Instructions 15 and 18.  Citing Blue Stone Land Co. v. Neff, 259 Va. 273, 526 S.E.2d 517 (2000), the Defendants argue that because the harmless error doctrine is never applied when the jury has been erroneously instructed, the jury's verdict must be set aside and the case remanded.

This Court has often found that where an erroneous instruction conflicts with an instruction that correctly states the law, the verdict must be set aside because it is impossible to determine which instruction was the basis for the jury's decision.  See, e.g., Doe v. Scott, 221 Va. 997, 1002-03, 277 S.E.2d 159, 162-63 (1981) (reversing due to instruction that incorrectly stated statutory duty); Redd v. Ingram, 207 Va. 939, 942, 154 S.E.2d 149, 152 (1967) (setting

25

aside jury verdict because even though erroneous instruction was counterbalanced by correct instruction, "we cannot know whether the jury followed [the erroneous] Instruction E(1) or [the correct] Instruction 2."); American Locomotive Co. v. Whitlock, 109 Va. 238, 243, 63 S.E. 991, 993 (1909)("The fact that [Instruction] No. 4 correctly stated the law does not cure the error of No. 1, which was a complete instruction in itself, and may have controlled the jury in their finding.").

Nevertheless, a jury verdict based on an erroneous instruction need not be set aside if it is clear that the jury was not misled. Shifflett v. Commonwealth, 221 Va. 191, 194, 269 S.E.2d 353, 355 (1980)(error in instruction cured by other instructions given); Tolston v. Reeves, 200 Va. 179, 183, 104 S.E.2d 754, 757 (1958)(instruction which misstates the law may be cured by a correct statement of the law in a separate instruction if it "plainly appears that the jury could not have been misled by the defective instruction").

Applying these principles, we conclude that, assuming without deciding that Instruction 14 was an erroneous statement of the law, such error does not require the jury verdict be set aside in this case. Instructions 15 and 18 set out the proper standard for determining Nurse Green's negligence. Thus the jury's verdict against Nurse Green was based on correct instructions.

Instruction 15 also stated, correctly, that if the jury found Nurse Green negligent, then Riverside also was negligent. "A jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). Therefore, having found Nurse Green negligent, a verdict against Riverside was required based Instruction 15. Because Instruction 15 ensured that the jury was not misled with respect to finding Riverside negligent, Tolston, 200 Va. at 183, 104 S.E.2d at 757, any error in Instruction 14 would not require that the verdict be set aside.

For the reasons stated, we find no error in the rulings of the trial court. Thus, we will affirm the judgment of the trial court.

Affirmed.

JUSTICE AGEE, with whom JUSTICE KEENAN joins, concurring in part and dissenting in part.

I agree with the majority opinion except as to Part I.B., which holds that Rule 5:25 applies to the Defendants' assignment of error on the admission of statistical evidence of other falls at Defendants' hospital ("Fall Evidence"). The majority opines in Part I.B. that Rule 5:25 required Defendants to reassert their prior objection to the Fall Evidence on the basis of relevance, or to ask the trial court to give the jury a cautionary instruction regarding the use of

27

such evidence, once the Estate nonsuited its punitive damages claim. In my view, the Defendants correctly and adequately objected to the admission of the Fall Evidence, and Rule 5:25 does not apply. Further, I would find the trial court erred in denying Defendants' objections to the Fall Evidence, which requires reversal of the judgment of the trial court.

Under Rule 5:25, we must examine whether an objection was made "with reasonable certainty" and that the objection was made "at the time of the ruling." My review of the record indicates the Defendants did so.

The Defendants first objected to the Fall Evidence in their motion in limine. The objection was clear, unequivocal and not limited to the "notice" argument on punitive damages, but went to the underlying negligence claim on the merits:

> [s]uch evidence is irrelevant, immaterial, likely to confuse and/or prejudice the jury, and should therefore be excluded in its entirety.

> . . . .

> Evidence of any previous falls is also misleading and confusing, because absent specific context, allowing the jury to hear such evidence could lead the jury to believe that a "patient fall" equals "negligence."

At the pre-trial hearing on the motion in limine, Defendants again objected to the relevance of the Fall Evidence and noted an exception to the trial court's ruling to admit the evidence. Although the trial court offered to

28

consider a cautionary instruction, it ruled the Fall Evidence would be admissible at trial.

When the Fall Evidence was offered at trial during the testimony of Joanne Friend, the Defendants again objected to its receipt for any purpose: "to show the jury the raw number of falls it's absolutely without any context whatsoever. It's confusing, it's misleading and reversible error, and I object to it." The Defendants then offered, and the Estate agreed to a "continuing objection" to avoid recurring argument during trial over whether the Fall Evidence was admissible. The Estate thereafter took a nonsuit as to its claim for punitive damages, thereby removing the argument that the narrow purpose of showing "notice" legitimized the introduction of the Fall Evidence.

The majority agrees that the Defendants, in their pre-trial motions and during Friend's testimony, "clearly objected to the Fall Evidence as irrelevant, immaterial and confusing or prejudicial to either the issue of notice or negligence" (emphasis added). However, the majority holds today that Defendants nonetheless waived their argument on appeal by not objecting yet again after the Estate nonsuited the punitive damages claim, citing as authority Riner v. Commonwealth, 268 Va. 296, 601 S.E.2d 555 (2004). I disagree with the

29

majority's conclusion and think <u>Riner</u> is distinguishable on this point.

Code § 8.01-384 provides, in pertinent part, "it shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor." The Defendants fulfilled this statutory requirement by at least <u>three</u> times objecting to the admission of the Fall Evidence for any purpose and letting the trial court know the action desired: exclusion of the evidence. The objections were not limited to the use of such evidence on the issue of notice, but plainly also went to its use for any purpose on the underlying claim of negligence. Nothing further was required, particularly in view of the Estate's acquiescence to the Defendants' "continuing objection."

Had the Defendants' objections been limited to the notice aspect, I would agree with the majority's analysis. However, it seems clear the Defendants' primary objection was the confusing and misleading information that the Fall Evidence could become to the jury on the fundamental issue of negligence.

In my view, the holdings cited from Riner are inapposite to the case at bar.[1]  In Riner, we held as barred by Rule 5:25 a defendant's claim on appeal that the trial court erred in failing to grant a change of venue motion.  Riner, 268 Va. at 310, 601 S.E.2d at 562-63.  However, the trial court had taken the motion under advisement, without objection from the defendant, and did not rule prior to the conclusion of trial. Id. at 307-09, 601 S.E.2d at 561-62.  We applied Rule 5:25 to the defendant's failure to raise the lack of ruling on the venue issue to the trial court's attention.  We similarly held as to defendant's separate failure to remind the trial court it had not ruled on a part of defendant's objection to certain hearsay evidence as a waiver of that claim under Rule 5:25. Id. at 310-11, 324-25, 601 S.E.2d at 562-63, 570-71.

In contrast to Riner, the trial court in the case at bar did not take Defendants' multiple objections to the Fall

---

[1] The Estate also cites Green v. Commonwealth, 266 Va. 81, 580 S.E.2d 834 (2003) and Breard v. Commonwealth, 248 Va. 68, 445 S.E.2d 670 (1994), for the proposition that Defendants here waived an objection under Rule 5:25 to the admission of the Fall Evidence.  However, these cases are no more on point than Riner.  Green, like Riner, involved the defendant's challenge to venue and subsequent failure to renew an objection after the trial court took the matter under advisement and later empanelled the jury.  Green, 266 Va. at 95, 580 S.E.2d at 842.  Breard also involved a trial court's invitation to a defendant, and the defendant's subsequent failure to renew an objection, after the court denied the motion to strike a juror "for the moment" but offered to

Evidence under advisement or fail to rule on those objections. The trial court clearly ruled by denying Defendants' objections each time. The Defendants did exactly what Code § 8.01-384 and Rule 5:25 required. They made clear, precise and timely objections, which went specifically to the issue of negligence and were not limited to the punitive damages claim.

The majority opinion does not address whether the Fall Evidence was admissible for purposes of establishing notice as an element of the Estate's punitive damages claim. However, even if one assumes the Estate could make its argument as to notice, that does not negate the otherwise valid and timely objection of the Defendants to admission of the Fall Evidence for any purpose on the basic issue of negligence.

We have held that raw statistical evidence is not probative of any issue in a medical malpractice case and should not be admitted. Holley v. Pambianco, 270 Va. 180, 185, 613 S.E.2d 425, 428 (2005). See also McCloud v. Commonwealth, 269 Va. 242, 259, 609 S.E.2d 16, 25 (2005) (evidence of a raw number of events, without describing their circumstances, can be misleading or confusing to the jury); Sanitary Grocery Co. v. Steinbrecher, 183 Va. 495, 499-500, 32 S.E.2d 685, 686-87 (1945) (evidence that 1,000 customers per

---

rehear the motion upon completion of voir dire. Breard, 248 Va. at 80, 445 S.E.2d at 677-78.

32

day visited grocery store without injury inadmissible as misleading and throwing no light upon the facts of the case before the jury).  Likewise, evidence of prior, similar acts confuses the jury and is not relevant to prove negligence. See, e.g., Stottlemyer v. Ghramm, 268 Va. 7, 13, 597 S.E.2d 191, 194 (2004) (holding "specific acts of bad conduct or prior acts of negligence" are not relevant to the issues in a medical malpractice case).

In Holley, an expert witness presented raw data, much like the Fall Evidence, showing the frequency of perforations during colonoscopies and polypectomies.  This testimony was admitted over objection despite the fact "the statistics contained no breakdown between those cases involving perforations caused by negligence and those that did not." 270 Va. at 184, 613 S.E.2d at 427. Counsel's closing argument referred to the risks in the context of the standard of care. We held the argument using statistical evidence "was based upon a premise unsupported by the evidence: That perforations are just as likely to occur in the absence of negligence as in its presence."  Id. at 185, 613 S.E.2d at 428.

The Fall Evidence in the case at bar serves the same inappropriate purpose as the statistical evidence in Holley and the evidence of prior acts in Stottlemyer.  The Fall Evidence is based on a similar unsupported premise as the

33

statistical evidence in Holley since falls are just as likely to result from another cause as from negligence. As such, the Fall Evidence "is not probative of any issue" and "should not be admitted." Holley, 270 Va. at 185, 613 S.E.2d at 428. Although also offered at trial as evidence of notice for the Estate's claim for punitive damages, the Fall Evidence could remain in the minds of the jurors long after the Estate nonsuited the punitive damages claim. Such evidence could reasonably be expected to have "excited prejudice and misled the jurors." Stottlemyer, 268 Va. at 12, 597 S.E.2d at 194.

The trial court's erroneous admission of the Fall Evidence as to the issue of negligence cannot be deemed harmless error. In determining the standard for harmless error, we are guided by Virginia's harmless-error statute, Code § 8.01-678.[2] When reviewing whether an error is harmless, we "must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless." Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731

---

[2] Code § 8.01-678 applies in both the civil and criminal context and states, in relevant part:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.

(2001).  In Clay, we adopted the United States Supreme Court's test for nonconstitutional harmless error, as articulated in Kotteakos v. United States, 328 U.S. 750 (1946):

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand.

Clay, 262 Va. at 259-60, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 764-65).  Applying the harmless error test and Code § 8.01-678, I cannot say that the admission of the Fall Evidence did not influence the jury, particularly in view of our existing precedent on similar statistical evidence.  Therefore, the error was not harmless.

A cautionary instruction would likewise have been insufficient under the circumstances.  The most common purposes of cautionary instructions are to cure improper remarks or comments made in the jury's presence, see Lewis v. Commonwealth, 269 Va. 209, 214, 608 S.E.2d 907, 910 (2005), or to caution the jury when questions by counsel are inappropriate.  See Lowe v. Cunningham, 268 Va. 268, 273, 601 S.E.2d 628, 631 (2004).  When considering the prejudicial nature of a statement or question offered before a jury, we

35

examine the relevance and content of the improper reference, whether the reference was deliberate or inadvertent in nature, and the probable effect of the improper reference.  Id.

Assuming, arguendo, that a cautionary instruction had been offered in the case at bar, I believe that the impact of the Fall Evidence would have made an overwhelming, improper influence on the outcome of the case for the reasons recited above.  We have held, in the civil context, that "a court is required to grant a new trial, if requested, when the prejudicial effect of an improper remark or question is overwhelming, such that it cannot be cured by a cautionary instruction."  Id.  Particularly in view of our precedent on the use of statistical evidence like the Fall Evidence, its impact could not be overcome by a cautionary instruction.

In my view, the Defendants properly preserved their objection to the admission of Fall Evidence and were under no requirement to make another objection after the Estate nonsuited the punitive damages claim.  For the reasons stated above, I conclude the trial court erred in denying the Defendants' objections and admitting the Fall Evidence.  This error was not harmless, could not have been cured by a cautionary instruction and requires reversal of the judgment of the trial court.  Therefore, I respectfully dissent from

Part I.B. of the majority opinion and would reverse the judgment of the trial court and remand for a new trial.