# CIRCUIT COURT OF THE CITY OF WINCHESTER

Tyler Boyer et al.

v.

Laura N. Dabinett et al.

February 28, 2007

Case Nos. (Law). 05-74 and 04-255

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on February 28, 2007, on the parties' pretrial motions. Charles J. Zauzig, III, and Melissa G. Ray, Esquires, appeared for the Plaintiffs; Tara M. McCarthy, Hillary A. Hollingsworth, and Ruth T. Griggs, Esquires, appeared for the Defendant Dabinett; and Richard L. Nagle and Heather N. Ellison, Esquires, appeared for the Defendant Winchester Obstetrics & Gynecology, P.L.C.

Upon consideration whereof, it is adjudged and ordered that the admissibility of scientific statements contained in treatises, periodicals, or pamphlets is governed by Virginia Code § 8.01-401.1. The filter through which this hearsay passes into evidence is the certification by an expert witness that the statements are reliable authority. Consequently, the qualifications of the expert limit the type of statements to those commonly relied upon in his field of expertise. Where statistical evidence is recited with no expression of the statistical confidence of the figures expressed, the reliability of the data relied upon is called into question. While most physicians are highly trained professionals, few of them are scientists.

Given those caveats, the Court considered the Plaintiffs' Motion in Limine to exclude statements in the medical literature designated by the Defendants, which is granted as to Gonik, "Defining forces that are

20

Associated with Shoulder Dystocia: The use of a mathematic dynamic computer model." American Jour. of Ob. and Gyn., vol. 188. This study used a commercial computer software package used to simulate motor vehicle crash situations to assess injuries sustained by the victims. *Id.* at 1068. The Supreme Court has rejected such theoretical modeling in automobile cases. *See Tittsworth v. Robinson,* 252 Va. 151 (1996) (automobile crash tests excluded); and Friend, *The Law of Evidence,* § 17-26. Since this methodology is rejected for highway accident reconstruction, which is the purpose for which the software which Gonik used was intended, its extrapolative application to a trip down the birth canal is likewise rejected. The irony is that Gonik's mathematical modeling is cited and relied upon by many of the articles designated by the Defendants, e.g., Defendant Winchester ObGyn Tab 13, H. Lerner, "Brachial Plexus Injury: The Role of Shoulder Dystocia," p. 14. But the Court will permit, the Defendants to read designated portions of the literature which just refer generally to Gonik's mathematical modeling.

The Plaintiffs' Motion in Limine to exclude statements in the medical literature designated by the Defendants is granted as to the recitation of all raw percentage data or incident figures in the designated medical literature about the incident of Erb's Palsy or Bracial Plexus injuries in relation to the total number of deliveries. However, the other portions of the designated articles, which do not recite the excluded percentages, may be read. This includes many other percentage figures which are purportedly descriptive of the birth experience where brachial plexus injuries occur. The excluded raw percentages are like the rate of incident figures in *Holley v. Pambianco,* 270 Va. 180 (statistical frequency of perforations of the colon wall 1/10,000 and 13/10,000 with no explanation as to cause of those perforations), in which the Supreme Court stated that "such raw statistical evidence is not probative of any issue in a medical malpractice case and should not be admitted." *Id.* at 185. The rate of iatrogenic incidents varies among medical centers and among practitioners. Consequently, such incident rates generally have no probative value in a particular case. Borrowing an analogy from automobile negligence actions, the fact that there have been only ten accidents in fifty years at a particular intersection has no probative value on the issue of whether the defendant driver was negligent in a particular case.

In the scientific study of human beings and their experiences and conditions, there are two types of statistical analyses based on groups. The first is the study of finite data sets, e.g. all patients within a hospital or hospital group. The second are randomized sample studies, which are generally undertaken to make scientifically based inferences about the population at large. While both provide the basis for legitimate scientific inference, the

statistical tools applied to the analysis of the respective data and the range of the permissible inferences based on the data are different. In most instances, the medical literature designated in this case focuses primarily on finite data sets. Statistical analysis is mathematically based, and it is a rigorous academic discipline; if its fundamental principles are disregarded, it can result in misleading conclusions and statements. *See generally* John L. Phillips, Jr., *How to Think about Statistics* (5th ed. 1995); Deborah Rumsey, *Statistics for Dummies* (2003); and Larry Gonick, *The Cartoon Guide to Statistics* (1993).

The origin of science is the desire to know causes, and the father of false science is the human tendency born of intellectual hubris to accept false causes rather than to acknowledge an inability to determine the cause given the existing data. Nothing is more intellectually dangerous than an erroneous conclusion espoused by a credible source. Consider how Copernicus and Galileo were treated by the pundits of the day when they publicized their scientific conclusions that the sun, not the earth, was the center of the solar system.

In the analysis of finite data sets, such as all the cases the author has seen or all the cases seen at a particular medical center, variable analysis of the data can be undertaken to test the author's hypotheses. For example, what effect does the mother's physical condition or circumstances of delivery (weight, age, number of deliveries, smoking, drug use, diabetes, traction, etc.) have on the result, e.g., Apgar scales, weights of delivered infants, or, specific to this case, brachial plexus injuries. Where correlations are found, the relative association between the variables will be expressed by a statistical measure, such as the correlation coefficient for bivariate analysis or confidence intervals for categorical variables (diabetic versus non-diabetic). Multi-variate analysis (age, weight, diabetic, number of deliveries, brachial plexus injury) can be done by the use of complex matrix analysis. Where an association between or among variables is found, that association will be expressed to some degree of statistical significance or confidence. Such studies can be useful to describe the experiences of a class of patients and whether a particular phenomenon occurs and whether there is an association between risk factors and that phenomenon. *See, e.g.* Defendants Tab 14, S. Chauhan, "Brachial Plexus Injury: A 23-year experience from a Tertiary Center"; note the "P values" are stated in this article; the "P value" weighs the strength of the evidence, this is the type of result that, in appropriate circumstances, could be read to the jury. If measures of statistical confidence are not expressed in the article, the data cannot be scientifically assessed, and the results, although neatly presented mathematically, are purely a collection of figures based on personal observations specific only to the group studied. Any inference drawn from

such data about the population in general or to a specific case is the author's guesstimate based on his personal experience and not a scientific estimate. *See, e.g.*, Defendants' Designation 5, "Shoulder Dystocia," ACOG Practice Bulletin, No. 7., October 1997, "In each case, risk factors could be identified, but their predictive value was not high enough to be useful in a clinical setting." This is the reason that so many of the articles use the phraseology that the evidence "suggests." *See, e.g.*, Defendant Winchester Obgyn's Designations 1, 4, 6, 9, 13. To suggest does not imply or state a reasonable degree of scientific probability; therein lies a paradox, the physician could not testify about a possible or suggested diagnosis or result in this case based on his personal treatment, but the learned treatise doctrine ostensibly permits the introduction of such problematical scientific evidence, so long as the expert witness testifies that the article containing the problematical statement is reliable. The results of the study of a finite set of patients may provide the premise for expanding the study to a randomized set of patients to test the hypothesis against a randomized sampling of patients or to find that a correlation exists between risk factors and results.

The articles identified by the Defendants are replete with recitations to observations based on finite date sets, not on randomized studies. If the defendants' experts identify the articles as authoritative, then they will be permitted to read the designated material. The treatise evidence in *Weinberg v. Given*, 252 Va. 221, 223 (1996), was simply numerical data that "85% percent of prescriptions of [oral contraception] written in the United States specify formulations containing 30 to 35 micrograms of ethinyl estradiol. . . ." The study upon which this statement was based was reportedly described in D. Mishell, "Oral Contraception: Past, Present and Future Perspectives," *Int. Journal of Fertility*, 1991, but there was no explanation as to the methodology producing the figures, so it came in under the rule of *ipse dixit* (because I say so). The irony is that a statistician is probably the best person to opine upon the reliability of the figures derived from any study cited as opposed to a physician, particularly if the physician has no training in statistics and the data which he opines is reliable is stated in simple raw percentages. These issues all go to the weight to be ascribed to the authorities by the jury, and these limitations can be revealed by cross examination and argued to the jury. *See* 52 Wash. & Lee L. Rev. 271.

In sample studies, the selection of the sample is critical to assessing the results, because the sample size and composition have a dramatic effect on the results. Therefore, scientific studies like clinical drug trials, use randomly selected samples to prevent selection bias, real or unintended. Any statistical result based on a sample can be expressed in terms of a margin of error

because the result is not certain because only a sample and not the entire population has been observed or subjected to analysis. Therefore, there is a "margin of error" in every sample study, which tells one how much the researcher expects his results to vary from sample to sample. If the margins of error are not expressed, the accuracy of the results cannot be scientifically assessed.

Therefore, for every percentage or statistic read to the jury, the expert witness shall be asked by the examiner at the time of introduction of the statement the following questions:

> Does the article from which you just read those figures contain a statement of the statistical confidence or reliability of the figures which you just read?
>
> If so, what does that measure of statistical confidence tell you about the reliability of those figures?
>
> If not, does the absence of such a measure of statistical confidence in the article have any effect upon your ability to assess the reliability of the figures which you just read?

The Plaintiffs' Motion in Limine to exclude statements in the medical literature designated by the Defendants is granted as to all letters to the editor, e.g. Defendant Winchester ObGyn Tab 3. No case has been cited to the Court where letters to the editor were accepted as reliable scientific authority. There was no evidence that letters to the editor are subject to the same academic scrutiny that is applied to scientific articles. Therefore, unless the witness has knowledge of the procedure by which letters to the editor are accepted by the journal which printed them or personally knows the author, there is no way that the witness can certify that the authority cited is reliable.

These rulings also apply to the scientific articles designated by the Plaintiffs, some of which contain the same defects.

Plaintiff's Motion in Limine to prohibit any evidence regarding failure to mitigate damages is granted as to Tyler Boyer's personal injury claim but denied as to his mother's claim for medical expenses. If evidence of failure to mitigate as to the Mother is presented, the jury will be instructed that the failure to mitigate applies only to the Mother's claim for medical expenses.

Defendant Dabinett's Second Motion to Reconsider Defendants' Motion to Dismiss Hope Anderson's case based on the Plaintiff Hope Anderson's lack of standing due to her having filed a bankruptcy which discharged the medical debts at issue in this case is denied. The Mother has the capacity to sue and has a direct interest in the case. This case is

distinguished from those cases in which the plaintiff lacked the legal capacity to sue. *Harmon v. Sadjadi,* 273 Va. 184 (2007); and *Fowler v. Winchester Med. Ctr.,* 266 Va. 131 (2003), both of which turn on the requirement that the duly qualified fiduciary is the only person who may file a wrongful death action. There is no question but that the mother is a real party in interest insofar as the infant's medical expenses are concerned. The dispositive issue is whether she is barred by law from asserting her right of action, and the Court has previously ruled on that point.

Defendants' Motion in Limine to prevent Plaintiffs from introducing the *de bene esse* deposition of Dr. Anthony Toth in the Plaintiffs' case in chief is granted in part and denied in part. *De bene esse* depositions are creatures of consent or court order, and they are taken because a witness, which is usually an expert witness, cannot attend the trial. There is no statute or rule of court specifically authorizing a *de bene esse* deposition. Since all depositions are governed by the Rules of Court, any deposition of a physician may potentially be used at trial pursuant to Rule 4:7(a)(4)(E); therefore, it is potentially a *de bene esse* deposition as that term has evolved. Under the Rules, to the extent that the evidence is admissible and relevant, all or part of the deposition may be read in by any party. Generally, where only part of the deposition is read, then as cross-examination, the other parties, defendants in this case, may read such relevant, admissible unread portions to the jury as they deem advisable.

While Dr. Toth's testimony, to the extent relevant, may be read about his treatment and diagnosis of Hope Anderson's medical condition, the motion in limine is granted to exclude Dr. Toth's testimony about his concerns and medical habits about a difficult delivery for Hope Anderson unless the evidence shows that he expressed those concerns to either Dr. Dabinett or to Hope Anderson. Otherwise, Dr. Toth's unrecorded, subjective concerns and medical habits are not relevant to this case.

Defendant Dabinett's Motion in Limine to exclude any reference to Tyler Boyer's learning disabilities and developmental delays is granted in part and denied in part. While there may be no medical evidence to show that these mental limitations were caused by the Defendants, the plaintiff has proffered that there is medical evidence that will be introduced to show that Tyler Boyer suffers from mental limitations that restrict his probable future employment options to more manual type employments and that, because of his arm injury, his employment opportunities are more restricted than those of the normal plaintiff, i.e. this is a variation of the "glass jaw plaintiff" argument. Accordingly, this evidence may be introduced on the issue of future loss of earning capacity.